JUDGE FRANK MONTALVO

FILED
2008 JUL 11 PM 3:02
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ________ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

EP 08 CV 0259

| | | |
|---|---|---|
| CHARLES BIRK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| HUB INTERNATIONAL SOUTHWEST AGENCY, LTD., | § | |
| | § | |
| | § | |
| Defendant. | § | |

**NOTICE OF REMOVAL**

Defendant, HUB INTERNATIONAL SOUTHWEST AGENCY, LTD. ("HUB" or "Defendant"), pursuant to 28 U.S.C. § 1446(a) and 28 U.S.C. § 1332(a), hereby files its Notice of Removal of *Birk v. Hub International Southwest Agency, Ltd.*, Case No. 2008-2305, pending in the District Court of El Paso County, Texas, 34th Judicial District (the "State Court Suit"). Defendant removes the State Court Suit on the basis of diversity jurisdiction and, in support hereof, states as follows:

## I. PLAINTIFF'S STATE-COURT CLAIMS

1. On June 11, 2008, Plaintiff filed the State Court Suit against HUB for declaratory judgment, breach of contract, and an accounting. A true and correct copy of all process, pleadings, and orders filed to date in the state court action, including Plaintiff's Original Petition and Plaintiff's First Amended Petition, is attached. HUB is the only defendant in the State Court Suit.

2. The essence of Plaintiff's claims is that, despite executing non-competition and non-solicitation agreements in conjunction with his employment with a predecessor of HUB,

Plaintiff is not bound by those agreements and is, instead, free to unfairly compete against HUB and to impermissibly contact and steal HUB's clients following his employment.

3. Plaintiff attempts to negate his obligations under his agreements by way of a declaratory judgment action, and also seeks commissions that HUB allegedly owes him.

4. HUB has yet to file a responsive pleading in the State Court Suit, but intends to deny the allegations and assert counterclaims for Plaintiff's violations of his employment agreement and for other authorized acts.

## II. BASES FOR REMOVAL

### A. Timeliness of Removal

5. Plaintiff filed the State Court Suit on June 11, 2008.

6. HUB has not been served with summons or with Plaintiff's Original Petition or First Amended Petition. It is HUB's understanding, however, that, as of July 7, 2008, Plaintiff has placed for service the summons and his First Amended Petition.

7. This Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b).

### B. Diversity Jurisdiction

8. Diversity before this Court is proper pursuant to 28 U.S.C. § 1332(a).

9. Plaintiff alleges that he is a resident of El Paso County, Texas.

10. Despite Plaintiff's inaccurate legal conclusion in his Petitions that HUB is a Texas corporation, HUB is, rather, a New Mexico corporation incorporated in the State of New Mexico with its principal place of business at 7770 Jefferson Avenue NE, Suite 101, Albuquerque, NM 87109.

11. Moreover, the amount in controversy exceeds $75,000. Plaintiff is attempting to nullify an agreement with HUB that would expose HUB's customers and clients to solicitation

by Plaintiff. The amount of lost profits, business opportunities, and goodwill that HUB would suffer in connection with Plaintiff's solicitation of HUB's customers and clients, together with the damages that HUB would incur as a result of Plaintiff's violation of his non-competition agreement with HUB and damages in connection with other related tort claims, exceed $75,000.

12. Simultaneous herewith, HUB is sending notice of this removal to the state court.

13. HUB meets all of its obligations under 28 U.S.C. § 1446.

WHEREFORE, Defendant, Hub International Southwest Agency, Ltd., requests this Court to accept jurisdiction of the State Court Suit, and for such further relief that this Court deems just and appropriate.

Respectfully submitted,

KEMP SMITH LLP
P.O. Box 2800
El Paso, Texas 79999-2800
915.533.4424
915.546.5360 (FAX)

By: ______________________
CHARLES C. HIGH, JR.
State Bar No. 09605000
GERALD G. HOWARD
State Bar No. 24032309

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served by CERTIFIED MAIL, RETURN RECEIPT REQUESTED on counsel for Plaintiff, Bryan H. Hall, Beck & Given, P.C., 5915 Silver Springs Dr., Bldg. 4, El Paso, Texas 79912 on the 11th day of July, 2008.

______________________
GERALD G. HOWARD

# Civil Docket

34th District Court

Case No. 2008-2305
El Paso County

July 11th, 2008
9:38am

BIRK, CHARLES vs. HUB INTERNATIONAL SOUTHWEST AGENCY, LTD.

Filed : 06/11/2008
Status: Filed
Type: BREACH OF CONTRACT

Judge
WILLIAM E. MOODY

Court Reporter

Events & Orders of the Court

| Date | | Volume | Page |
|---|---|---|---|
| 06/11/08 | PLN ORIGI PETI | | |
| 06/26/08 | CITATION BY AGENT Issued -Defendant, HUB INTERNATIONAL SOUTHWEST AGENCY, LTD. | | |
| 07/01/08 | 1ST AMENDED PETITION<br>PLNS/ GM | | |

A TRUE COPY, I CERTIFY
GILBERT SANCHEZ, District Clerk
By Lisa Herriot DEPUTY
JUL 1 1 2008

DISTRICT COURTS EL PASO COUNTY, TEXAS

IN THE DISTRICT COURT OF EL PASO COUNTY TEXAS
327 JUDICIAL DISTRICT

| | | |
|---|---|---|
| CHARLES BIRK, | ) | |
| Plaintiff, | ) | |
| v. | ) | Cause No. 2008-3305 |
| HUB INTERNATIONAL SOUTHWEST AGENCY, LTD., | ) | |
| Defendant. | ) | |

## PLAINTIFF'S ORIGINAL PETITION

TO THE COURT:

COMES NOW, CHARLES BIRK ("BIRK"). Plaintiff, and files his Plaintiff's Original Petition against HUB INTERNATIONAL SOUTHWEST AGENCY, LTD. ("HUB"), and would show the Court as follows:

### I. DISCOVERY CONTROL PLAN

1. Discovery in this action is intended to be conducted at level 2 in accordance with Rule 190.3, Texas Rules of Civil Procedure.

### II. PARTIES

2. At all relevant times hereto, BIRK has been and continues to be a resident of El Paso County, Texas.

3. HUB is a Texas corporation and may be served with process by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 701 Brazos Street, Suite 1050, Austin, Texas, 78701.

4. Venue is proper with this Court because the events in question occurred in El Paso County, Texas, HUB maintains an office in El Paso County, Texas, and Plaintiff is a resident of El Paso County, Texas.

## III. BACKGROUND

5. BIRK was formally employed by HUB, which claims that BIRK is subject to a Non-Solicitation Agreement dated November 1, 2002. The agreement in question, however, was not with HUB, but with Talbot Agency, Inc. ("Talbot"). On or about June 3, 2008, an attorney for HUB sent a letter to BIRK in El Paso County, Texas, a true and correct copy of which is attached hereto as **Exhibit "A."** HUB claims that BIRK has "contacted, interfered with, and diverted at least one customer," demands that BIRK "immediately cease any further activities in violation" of the purported Non-Solicitation Agreement, and requests payment from BIRK of $6,800.00. The June 3, 2008 letter claims that HUB will "have no choice but to take whatever further legal steps may be necessary." BIRK denies that he has violated any obligation or duty owed to HUB.

6. BIRK was originally an insurance agent for the Gillette Agency, which was acquired by Talbot in approximately 2002.

7. Talbot required that BIRK execute a Non-Solicitation Agreement dated November 1, 2002 (the "Talbot Agreement"), attached hereto as **Exhibit "B."** The Talbot Agreement did not contain a non-competition provision which would extend past BIRK'S employment with Talbot, but included a "Solicitation Following Termination" provision.

8. Talbot was subsequently acquired by HUB or another affiliated entity. The details of the underlying transaction are unknown at this time to BIRK.

9. BIRK was required to execute annual employment agreements with HUB, which included non-compete and non-solicitation provisions. During the last year of his employment with

HUB, BIRK was required to execute the employment agreement attached hereto as **Exhibit "C"** (the "HUB Agreement"). Section VII of the HUB Agreement is entitled Non-Solicitation, and sets forth certain terms of the agreement between HUB and BIRK.

10. On April 8, 2008, HUB summarily terminated BIRK'S employment, effective immediately. There was no voluntary termination by BIRK of his employment with HUB.

11. Section VII of the HUB Agreement provides that the non-competition and non-solicitation provisions are applicable only upon the employee's "voluntary termination." Since HUB chose to terminate the employment of BIRK, the HUB Agreement does not preclude BIRK from competing with HUB or from contacting or soliciting any of the entities which he dealt with while he was associated with HUB.

12. Section VII also provides that if the employee has executed another non-compete, non-solicitation or employment contract with HUB, the terms of such other agreement shall remain in full force and effect. BIRK, however, did not enter into another non-competition or non-solicitation agreement with HUB, other than the annual employment agreements whose non-solicitation provisions do not apply in the event the employee's termination is not voluntary.

13. HUB is apparently aware that its own agreements with BIRK have no applicability to the present case since BIRK'S employment with HUB was not voluntarily terminated. Instead, HUB improperly attempts to rely on an old employment agreement with another company back in 2002, some five and one-half years ago, notwithstanding the subsequent and controlling agreements between BIRK and HUB.

14. Even if applicable, which it is not, the Talbot Agreement is not enforceable against a Texas resident working in Texas. The Talbot Agreement does not comply with Texas law, including Sections 15.50-51, Texas Business & Commerce Code. Further, the Talbot Agreement

has been superceded by the HUB agreement and the claimed non-solicitation provision is not enforceable by HUB against BIRK under the facts and circumstances of this case.

15. When BIRK was terminated, HUB owed BIRK payment of commissions for policies which were generated or renewed in 2008 before the termination of his employment. Although payment has been requested, HUB has failed to pay the commissions due to BIRK, which remain outstanding at this time.

## IV. CAUSES OF ACTION

A. Declaratory Judgment

16. Plaintiff incorporates the allegations set forth in paragraphs 5 through 15 herein.

17. A genuine controversy exists between BIRK and HUB with respect to the obligations of the parties under the Talbot Agreement, if any, the claim by HUB that BIRK is obligated under any non-competition or non-solicitation agreement, and the claim by HUB that BIRK has violated any agreement between BIRK and HUB.

18. A justiciable controversy exists regarding the rights and obligations, if any, of the parties to this litigation arising under the Talbot Agreement and the HUB Agreement, which requires resolution by this Court.

19. BIRK requests that this Court enter a declaratory judgment declaring that BIRK is not subject to any non-compete or non-solicitation agreement with HUB, that BIRK is free to compete and pursue gainful employment as he sees fit, that BIRK is entitled to contact, solicit and obtain the business of any person or entity, including current or former clients of HUB, that the HUB Agreement sets forth the duties and obligations of the parties, if any, superseding the old Talbot Agreement, that any purported non-solicitation obligations of BIRK under either the Talbot Agreement or HUB Agreement are void and not enforceable in Texas under the facts and

circumstances of this case, and that HUB has no viable claim against BIRK, including any matter arising after the termination of his employment by HUB and the issues raised by the June 3, 2008 letter from counsel for HUB.

20. As a result of the actions of HUB, BIRK has been required to retain the undersigned firm to file this suit and represent him in this controversy. BIRK requests that he be awarded his reasonable and necessary attorney's fees and expenses as provided by Section 37.009, Texas Civil Practice & Remedies Code.

B. Breach of Contract

21. BIRK incorporates all the allegations in paragraphs 5 through 15 as if fully set forth herein.

22. HUB has breached its obligations under its agreement with BIRK and has failed to pay commissions which are due and owing to BIRK.

23. BIRK seeks recovery of all commissions due and owing to him for policies which were generated or renewed by HUB to which he is entitled to commissions.

C. Request for Accounting

24. BIRK incorporates all the allegations in paragraphs 5 through 15 as if fully set forth herein.

25. BIRK requests an accounting of all commissions due and owing to him by HUB for all policies which were generated or renewed to which he is entitled to payment of commissions.

**V. ATTORNEY'S FEES**

26. Due to the above wrongful conduct of HUB and its failure to pay the commissions due and owing to BIRK, Plaintiff requests that he be awarded his reasonable and necessary attorney's

fees and court costs incurred in this matter pursuant to Chapter 38 and Section 37.009, TEX. CIV. PRAC. & REM. CODE.

27. BIRK reserves the right to amend his pleadings in this case as additional facts and additional damages become known.

28. BIRK designates Bryan H. Hall as a member of the firms of attorneys representing him who will be lead counsel in this case.

Respectfully submitted,

**BECK & GIVEN, P.C.**
5915 Silver Springs Dr., Bldg. 4
El Paso, Texas 79912
TEL: (915) 544-5545
FAX: (915) 544-1620

By: ______________________
Bryan H. Hall
State Bar No. 08744800

FILED
GILBERT SANCHEZ
DISTRICT CLERK
2008 JUL 1 AM 10 38
EL PASO COUNTY, TEXAS
BY ________
DEPUTY

**IN THE DISTRICT COURT OF EL PASO COUNTY, TEXAS**

**34TH JUDICIAL DISTRICT**

| | | |
|---|---|---|
| CHARLES BIRK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 2008-2305 |
| | ) | |
| HUB INTERNATIONAL SOUTHWEST AGENCY, LTD., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S FIRST AMENDED PETITION**

TO THE COURT:

COMES NOW, CHARLES BIRK ("BIRK"), Plaintiff, and files this Plaintiff's First Amended Petition against HUB INTERNATIONAL SOUTHWEST AGENCY, LTD. ("HUB"), and would show the Court as follows:

## I. DISCOVERY CONTROL PLAN

1. Discovery in this action is intended to be conducted at level 2 in accordance with Rule 190.3, Texas Rules of Civil Procedure.

## II. PARTIES

2. At all relevant times hereto, BIRK has been and continues to be a resident of El Paso County, Texas.

3. HUB is a Texas corporation and may be served with process by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 701 Brazos Street, Suite 1050, Austin, Texas, 78701.

4. Venue is proper with this Court because the events in question occurred in El Paso County, Texas, HUB maintains an office in El Paso County, Texas, and Plaintiff is a resident of El Paso County, Texas.

## III. BACKGROUND

5. BIRK was formally employed by HUB, which claims that BIRK is subject to a Non-Solicitation Agreement dated November 1, 2002. The agreement in question, however, was not with HUB, but with Talbot Agency, Inc. ("Talbot"). On or about June 3, 2008, an attorney for HUB sent a letter to BIRK in El Paso County, Texas, a true and correct copy of which is attached hereto as **Exhibit "A."** HUB claims that BIRK has "contacted, interfered with, and diverted at least one customer," demands that BIRK "immediately cease any further activities in violation" of the purported Non-Solicitation Agreement, and requests payment from BIRK of $6,800.00. The June 3, 2008 letter claims that HUB will "have no choice but to take whatever further legal steps may be necessary." BIRK denies that he has violated any obligation or duty owed to HUB.

6. BIRK was originally an insurance agent for the Gillette Agency, which was acquired by Talbot in 2002.

7. Talbot required that BIRK execute a Non-Solicitation Agreement dated November 1, 2002 (the "Talbot Agreement"), attached hereto as **Exhibit "B."** The Talbot Agreement did not contain a non-competition provision which would extend past BIRK'S employment with Talbot, but included a "Solicitation Following Termination" provision.

8. Talbot was subsequently acquired by HUB or another affiliated entity. The details of the underlying transaction are unknown at this time to BIRK.

9. BIRK was required to execute annual employment agreements with HUB, which included non-compete and non-solicitation provisions. During the last year of his employment with

HUB, BIRK was required to execute the employment agreement attached hereto as **Exhibit "C"** (the "HUB Agreement"). Section VII of the HUB Agreement is entitled Non-Solicitation, and sets forth certain terms of the agreement between HUB and BIRK.

10. On April 8, 2008, HUB summarily terminated BIRK'S employment, effective immediately. There was no voluntary termination by BIRK of his employment with HUB.

11. Section VII of the HUB Agreement provides that the non-competition and non-solicitation provisions are applicable only upon the employee's "voluntary termination." Since HUB chose to terminate the employment of BIRK, the HUB Agreement does not preclude BIRK from competing with HUB or from contacting or soliciting any of the entities which he dealt with while he was associated with HUB.

12. Section VII also provides that if the employee has executed another non-compete, non-solicitation or employment contract with HUB, the terms of such other agreement shall remain in full force and effect. BIRK, however, did not enter into another non-competition or non-solicitation agreement with HUB, other than the annual employment agreements whose non-solicitation provisions do not apply in the event the employee's termination is not voluntary.

13. HUB is apparently aware that its own agreements with BIRK have no applicability to the present case since BIRK'S employment with HUB was not voluntarily terminated. Instead, HUB improperly attempts to rely on an old employment agreement with another company back in 2002, some five and one-half years ago, notwithstanding the subsequent agreements between BIRK and HUB.

14. Even if applicable, which it is not, the Talbot Agreement is not enforceable against a Texas resident working in Texas. The Talbot Agreement does not comply with Texas law, including Sections 15.50-51, Texas Business & Commerce Code. Further, the Talbot Agreement

has been superceded by the HUB agreement and the claimed non-solicitation provision is not enforceable by HUB against BIRK under the facts and circumstances of this case.

15. When BIRK was terminated, HUB owed BIRK payment of commissions for policies which were generated or renewed in 2008 before the termination of his employment. Although payment has been requested, HUB has failed to pay the commissions due to BIRK, which remain outstanding at this time.

## IV. CAUSES OF ACTION

A. Declaratory Judgment

16. Plaintiff incorporates the allegations set forth in paragraphs 5 through 15 herein.

17. A genuine controversy exists between BIRK and HUB with respect to the obligations of the parties under the Talbot Agreement, if any, the claim by HUB that BIRK is obligated under any non-competition or non-solicitation agreement, and the claim by HUB that BIRK has violated any agreement between BIRK and HUB.

18. A justiciable controversy exists regarding the rights and obligations, if any, of the parties to this litigation arising under the Talbot Agreement and the HUB Agreement, which requires resolution by this Court.

19. BIRK requests that this Court enter a declaratory judgment declaring that BIRK is not subject to any non-compete or non-solicitation agreement with HUB, that BIRK is free to compete and pursue gainful employment as he sees fit, that BIRK is entitled to contact, solicit and obtain the business of any person or entity, including current or former clients of HUB, that the HUB Agreement sets forth the duties and obligations of the parties, if any, superseding the old Talbot Agreement, that any purported non-solicitation obligations of BIRK under either the Talbot Agreement or HUB Agreement are void and not enforceable in Texas under the facts and

circumstances of this case, and that HUB has no viable claim against BIRK, including any matter arising after the termination of his employment by HUB and the issues raised by the June 3, 2008 letter from counsel for HUB.

20. As a result of the actions of HUB, BIRK has been required to retain the undersigned firm to file this suit and represent him in this controversy. BIRK requests that he be awarded his reasonable and necessary attorney's fees and expenses as provided by Section 37.009, Texas Civil Practice & Remedies Code.

B. Breach of Contract

21. BIRK incorporates all the allegations in paragraphs 5 through 15 as if fully set forth herein.

22. HUB has breached its obligations under its agreement with BIRK and has failed to pay commissions which are due and owing to BIRK.

23. BIRK seeks recovery of all commissions due and owing to him for policies which were generated or renewed by HUB to which he is entitled to commissions.

C. Request for Accounting

24. BIRK incorporates all the allegations in paragraphs 5 through 15 as if fully set forth herein.

25. BIRK requests an accounting of all commissions due and owing to him by HUB for all policies which were generated or renewed to which he is entitled to payment of commissions.

## V. ATTORNEY'S FEES

26. Due to the above wrongful conduct of HUB and its failure to pay the commissions due and owing to BIRK, Plaintiff requests that he be awarded his reasonable and necessary attorney's

fees and court costs incurred in this matter pursuant to Chapter 38 and Section 37.009, TEX. CIV. PRAC. & REM. CODE.

27. BIRK reserves the right to amend his pleadings in this case as additional facts and additional damages become known.

28. BIRK designates Bryan H. Hall as a member of the firms of attorneys representing him who will be lead counsel in this case.

Respectfully submitted,

**BECK & GIVEN, P.C.**
5915 Silver Springs Dr., Bldg. 4
El Paso, Texas 79912
TEL: (915) 544-5545
FAX: (915) 544-1620

By:____________________
Bryan H. Hall
State Bar No. 08744800

# EXHIBIT "A"



2 North LaSalle Street, Suite 1300
Chicago, Illinois 60602
312.346.8380
Fax: 312.346.8434
www.lplegal.com

Peter F. Donati
(312) 476-7590
PDONATI@LPLEGAL.COM

June 3, 2008

**VIA FEDERAL EXPRESS**

Mr. Charles Birk
C.D. Lee/Britton Agency
2244 Trawood, Suite 208
El Paso, TX 79935

**Re: Non-Solicitation Agreement**
**Our File Number 36410-72623.005**

Dear Mr. Birk:

This firm has been retained as litigation counsel by Hub International Southwest Agency Limited ("Hub" or the "Company").

As you know, you are party to a Non-Solicitation Agreement dated November 1, 2002 with a predecessor of Hub, Talbot Agency, Inc. (the "Non-Solicitation Agreement"). Pursuant to the Non-Solicitation Agreement, you agreed that for two years following the termination of your employment for any reason, you would not, among other things, "solicit, contact, interfere with, re-write or divert" any customer of the Company. You also agreed to maintain the confidentiality of, and not to use for the benefit of any other entity, secret or confidential information or customers lists belonging to the Company.

Notwithstanding the contractual obligations described above, it has come to the attention of Hub that you have contacted, interfered with, and diverted at least one customer, Tom Beard. Hub has been notified by Mr. Beard that he wants to transfer his policies to you at your new agency

The purpose of this letter is to demand that you immediately cease any further activities in violation of your Non-Solicitation Agreement. In addition, in accordance with Section 3 of the Non-Solicitation Agreement, you must tender payment to Hub in the amount of $6,800, which constitutes two times the annual commission for Mr. Beard. You should note that this payment is intended to compensate Hub for the harm already caused by your misconduct, and it does not excuse you from compliance with your ongoing non-solicitation obligations.

Hub takes breaches of restrictive covenants very seriously. If on or before June 11, 2008 you have not (i) certified your intention to comply in the future with all of your obligations under the Non-Solicitation Agreement and (ii) tendered to Hub the payment described in the preceding paragraph, Hub will have no choice but to take whatever further legal steps may be necessary to protect its confidential information, goodwill, and customer relationships.

In this regard, you are hereby advised to preserve emails, letters, notes, and other information relating to Hub's potential claims, including, but not limited to, information relating to your hiring by C.D. Lee/Britton Agency (the "Britton Agency") and your communications with Hub's customers. Your failure to preserve such information may constitute spoliation of evidence and expose you to civil, and in some cases even criminal, sanction.

To the extent your new employer the Britton Agency had knowledge of your contractual obligations under the Non-Solicitation Agreement and nevertheless allowed you to solicit or interfere with Hub's customer relationships, it may be liable for your wrongful conduct as well as separately liable for its own tortious interference. Accordingly, a copy of this letter is being sent to the Britton Agency.

We trust that you will take the steps demanded by Hub to bring yourself back into compliance with your contractual obligations. Please direct all further communications relating to this matter to the undersigned.

Sincerely,

Peter F. Donati

PFD:aj

# EXHIBIT “B”

NON-SOLICITATION AGREEMENT

by and between

Charlie Birk

and

TALBOT AGENCY, INC.

This Agreement is made and entered into on 11/1, 2002, by and between Charlie Birk ("Employee") and Talbot Agency, Inc., a New Mexico corporation ("TA").

Whereas, TA and Employee wish to set forth herein certain terms and conditions relating to the employment of Employee by TA;

1. Non-Competition. Except to the extent permitted by paragraph 4, during the term of employment with TA, Employee shall not, without the prior written consent of TA, which consent may be withheld at the sole discretion of TA, engage in or in any manner be connected or concerned, directly or indirectly, whether as an officer, director, stockholder, partner, owner, employee, creditor or otherwise, with the operation, management or conduct of any business that competes with or is of a nature similar to that of TA.

2. Confidentiality. During the term of employment with TA and following the termination thereof for any reason, Employee shall not make any use for his own benefit or for the benefit of a business or entity other than TA, of any secret or confidential information, customer lists or any other data of or pertaining to TA, its business and financial affairs or its services not generally known within TA's trade and which was acquired by him during his affiliation with TA.

3. Solicitation Following Termination. Following the termination of the term of employment with TA, regardless of the cause thereof, and continuing during the period which expires on the second anniversary of such termination, Employee shall not (a) solicit, contact, interfere with, re-write or divert any customer served by TA during the period of the Employee's employment hereunder; or (b) solicit any person then or previously employed by TA to join Employee, whether as a partner, agent, employee or otherwise, in any enterprise engaged in a business similar to the business of TA being conducted at the time of such termination.

With respect to (a) above, it is agreed by the parties that non-compliance resulting in loss of business to TA entitles TA to receive from Employee, and Employee agrees to promptly pay, two times the annual commission for any and all business that leaves TA, Inc. as a direct or indirect result of non-compliance with (a) above.

4. Permitted Activities. Nothing in this Agreement shall preclude Employee from investing his funds in such manner as will not require any services on his part in the operation of the affairs of any business enterprise, provided that such investment by Employee does not constitute more than 5% of the outstanding securities of that securities exchange.

5. Acknowledgement. Employee acknowledges that the restrictions set forth in paragraphs 1, 2, and 3 are reasonable in scope and essential to the preservation of TA's business and proprietary properties and that the enforcement thereof will not in any manner preclude Employee, in the event of Employee's termination of employment with TA, from becoming gainfully employed in such manner and to such extent as to provide a standard of living for himself, the members of his family, and those dependent upon him of at least the sort and fashion to which he and they have become accustomed and may expect.

6. Severability. The covenants of Employee contained in this Agreement shall each be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action on Employee against TA, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by TA of such covenants. Both parties hereby expressly agree and contract that it is not the intention of either party to violate any public policy or statutory or common law, and that if any sentence, paragraph, clause or combination of the same of this Agreement is in violation of the law of any state where applicable, such sentence, paragraph, clause or combination of the same shall be void in the jurisdictions where it is unlawful, and the remainder of such paragraph and this Agreement shall remain binding on the parties to make the covenants of this Agreement binding only to the extent that it may be lawfully done under existing applicable laws. In the event that any part of any

covenant of this Agreement is determined by a court of law to be overly broad, thereby making the covenant unenforceable, the parties hereto agree and it is their desire that such court shall substitute a judicially enforceable limitation in its place, and that as so modified the covenant shall be binding upon the parties as if originally set forth herein.

7. Amendment and Waiver. No amendment or modification of this Agreement shall be valid or binding upon TA unless made in writing and signed by a duly authorized officer of TA or upon Employee unless made in writing and signed by him. The waiver by TA of the breach of any provision of this Agreement by Employee shall not operate or be construed as a waiver of any subsequent breach by him.

8. Governing Law. This Agreement shall be governed by and construed in accordance with the substance laws of the State of New Mexico without giving effect to the principles of conflict of law thereof.

9. Entire Agreement. This Agreement contains all the terms agreed upon by the parties with respect to the subject matter hereof and supersedes all prior agreements, arrangements and communication between parties dealing with such subject matter, whether oral or written.

10. Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the transferees, successors and assigns of TA, including any company or corporation with which TA may merge or consolidate.

11. Remedies for Breach. Employee specifically acknowledges that irreparable injury will result to TA and its business and property in the event of a breach of the terms and conditions of this Agreement to be performed by him. Employee, therefore, agrees that in the event of this breach of any of the terms and conditions of this Agreement to be performed by him, TA shall be entitled, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction, either at law or in equity, to enjoin him from performing services for any other person, firm or corporation in violation of any of the terms of this Agreement and to obtain damages for any breach

# EXHIBIT "C"





**Hub International Southwest**
**2008 Producers Incentive Compensation Plan**

**Section I**
**Plan Purpose**

To recognize and reward high performance of Producers for cultivating and expanding profitable business relationships while delivering high quality service.

**Section II**
**Plan Eligibility: Producers to include:**

1. Commercial P&C Account Executive
2. Commercial P and C Account Managers
3. Commercial P and C Small Business Account Manager
4. Agent/Personal Service Account Manager/Personal Sales Account Manager
5. Employee Benefits Account Executive
6. Employee Benefits Account Managers

**Index**


| | |
|---|---|
| Plan Purpose | Section I |
| Plan Eligibility | Section II |
| Plan Compensation | Section III |
| Plan Payment Schedule | Section IV |
| Effective Date of the Plan | Section V |
| Plan Administration | Section VI |
| Non-Solicitation | Section VII |
| Confidentiality | Section VIII |
| At-Will Employment | Section IX |

**Section III**
**Plan Compensation by position**

Commercial P&C Account Executive

**Description:** Account Executives are paid for maintaining and increasing agency revenue. Producers are classified based on the amount of revenue they produce from clients for providing risk management and commercial management services.

**Producer Classifications and qualifying commission:**

- There are 2 classifications of producers – Level 1 or 2. These classifications are determined by the amount of annualized revenue produced during the preceding incentive compensation calendar year.
- New producers – usually less than 3 years experience and in developmental stages – are placed on a salary and commission program that matches the Account Manager plan. They will continue on the plan until the move to the 100% incentive. Plans other then this for new producers need president approval.
- The regional vice president may assign up to 10% of the smallest accounts (# of accounts) of any producer to a small business unit during a calendar year. The producer will no longer be involved with those accounts for servicing purposes. However, the producer will receive the annual commission for any assigned accounts for one year (12 months), following the date when reassigned, even if the account cancels.
- Commission revenue is always calculated net of broker costs. Furthermore, any broker relationships must be approved by a Regional Vice President.
- Any new commercial account producing below $500 in revenue may be assigned to the small business unit if available. **Producers will not be paid on new and renewal accounts with less then $500 of revenue. However SCA will be treated differently due to agreements within the purchase.** The account will be assigned to a producer outside of the small business unit when revenue reaches more then $1000 in revenue.
- Overrides, contingency, retention bonus, persistency bonus etc. or any other additional commission paid by the company will not be included as commission income and will not be included as new or renewal income for payment to the account executive.

| Producer Classification | Previous year revenue production | Percentage paid |
|---|---|---|
| Level 1 | $0-499,999 | 28% |
| Level 2 | $500,000+ | 30% |
| Bonds and Builders Risk | | 38% |

**New business commission:**

- For all new business producers will be paid an additional 10% for the first year only.
- New business is defined as a bound insurance policy where the business or individual has not placed insurance coverage for the same type of policy i.e. property, d and o, liability etc. with hub international within the last twelve months.
- **Bonds are paid 38% on all business new or renewal but producer classifications will not exist and business above $500,000 will not be eligible for an additional 2%.**
- **Builders risk will be treated as new business**
- Producers are only paid on accounts that producer more then $500 in revenue.

Commission splits:

- Joint sales between producers (two commercial P&C account executives or two group benefit account executives) may be split as determined by producers for new and renewals. Commission will only be

credited toward one producer for producer classification. Commission will not exceed that which would be paid for a single producer. Producers must be properly licensed to receive commission and will not be paid on insurance for which they are not licensed.

- Group benefit referrals will pay 10% commission first year for commercial account executives.
- Commercial P&C referrals will pay 10% commission first year for group benefit account executives.
- All commission split business will count toward new business goals for the lead and will only be credited toward lead producer for hub international producer recognition.

Cancellation of accounts and charge back of commission

- Binder bill invoice 30 days prior to due date, when possible.
- Mail statement to client on due date.
- Mail statement with letter at 30 days past due.
- Service and sales team assigned to account follows up with client by phone at 45 days past due.
- Send out cancellation notice at 60 days past due and all producer commission for account is charged back to the producer.
- If it is determined by management to keep the account in force and later the policy is cancelled and any premium is charged back to the corporation all commissions are charged back to the producer.
- Write off – 100% of the account receivable at 120 days and all commission is charged back to the producer.
- **If a producer binds coverage on a minimum earned commission without having received payment for the minimum earned portion of the premium the producer is responsible for collecting the minimum earned commission. If unable to collect the minimum earned premium, this amount will be deducted from any true ups until the amount is fully repaid.**

Calculation of Draw:

Current year base draw will be 80% of prior year commission. This can be adjusted by the regional vice president upward by 10%, to 90% but above that amount will require president approval. The draw can be adjusted downward without limits by the regional vice president.

Commission will be trued up Quarterly and will be paid normally in the second pay check following the end of the period.

Sample Calculation

Jim's 2005 revenue production is $612,000 of revenue and is thus classified as a level 2 producer (previous year production). He produces revenue of $700,000 in 2006 and is paid 30% of $700,000 or $210,000. Furthermore, $100,000 of the $700,000 is "new business" and is paid 10% of the $100,000 or $10,000. He also had an account cancel on him that and where a receivable was not collected and written off. This caused a charge back of commission of $3000. Thus the total amount paid to Jim for 2006 was $217,000.

**Section III Continued**
**Plan Compensation by position**

---

**Commercial Property and Casualty Account Managers**

**Description:** Account Managers are paid for further cross sales of additional products and services deemed to be new business to an account that they have sole responsibility for servicing and maintaining or new clients they prospect and sell while in the position of Account Managers.

Payment of Commission:

In addition to the salary that is paid to this position, the individual has the following opportunity to earn commission based on the following formula:

Compensation paid as a percentage of first year gross commission earned – 20%.

New business is defined as a bound insurance policy where the business or individual has not placed insurance coverage for the same type of policy i.e. property, d and o, liability etc. with hub international within the last twelve months. No other producer may be paid commission on this policy or no sharing of commission may occur on this policy for the 20% to be paid.

**Sample calculation:**

Jim is working as an Account Manager and sold one additional policy on the plans he services. The revenue from the account is $2,000 and thus he is paid $400.

**Section III Continued**
**Plan Compensation by position**

---

**Commercial Property and Casualty Small Business Account Executive**

**Description:** Small business producers are paid additional incentive beyond their base for the sale of insurance.

Payment of Commission:

In addition to the salary that is paid to this position, the individual has the following opportunity to earn commission based on the following formula:

Compensation is paid as a percentage of first term commission as recognized by Hub's revenue recognition policy. The account executive is paid 20% of first term commission. If the producer exceeds $16,500 of revenue per quarter they are paid an additional 10% of gross commission.

New business is defined as a bound insurance policy where the business or individual has not placed insurance coverage for the same type of policy i.e. property, d and o, liability etc. with hub international within the last twelve months. No other producer may be paid commission on this policy or no sharing of commission may occur on this policy.

**Sample calculation:**

Jim is working as a Small Business Producer and sold $17,000 of commission for the quarter. The producer is paid 20% of the $17,000 or $3,400. In addition the producer is paid 10% or an additional $1,700 because the total commission exceeds $16,500 for the quarter. The following quarter the producer sells $10,000 of commission. The producer is paid 20% of $10,000 or $2,000 and is not eligible for additional compensation because production is below $16,500.

**Section III Continued**
**Plan Compensation by position**

---

**Agent/ Personal Service Account Manager/Personal Sales Account Manager**

**Description:** Incentive is paid for revenue generated in excess of salary from new business or cross sale of existing business. Eligible personnel are paid a percentage of revenue for selling personal lines insurance.

**Formula:**
Agent/ Personal Service Account Managers will be paid as a percentage of gross commission produced

New business is defined as a bound insurance policy where the business or individual has not placed insurance coverage for the same type of policy i.e. property, d and o, liability etc. with hub international within the last twelve months. This includes individual life and health products.

The agent/personal service account manager will be paid 20% of first term commission.

The incentive will be paid monthly.

Sample Calculation:

Jim sells $25,000 of premium at 12% commission so the agency earns a total of $3000 of commission. Jim will be paid a $600 incentive. .

**Please note:**
**Individuals who sell individual life and health products or commercial property and casualty products, will, in addition to earning incentive on personal property and casualty, will also earn incentive based on the Account Manager incentive descriptions attached to this incentive plan.**

**Section III Continued**
**Plan Compensation by position**

Employee Benefits Account Executive
Group benefits, group life and benefits programs sold by the account executive.

**Producer Classifications and qualifying commission:**

- There are 2 classifications of producers – Level 1 or 2. These classifications are determined by the amount of annualized revenue produced during the preceding incentive compensation calendar year.
- New producers – usually less than 3 years experience and in developmental stages – are placed on a salary and commission program that matches the Senior CSA plan. They will continue on the plan until the move to the 100% incentive. Plans other than this for new producers need president approval.
- The regional vice president may assign up to 10% of the smallest accounts (# of accounts) of any producer to a small business unit during a calendar year. The producer will no longer be involved with those accounts for servicing purposes. However, the producer will receive the annual commission for any assigned accounts for one year (12 months), following the date when reassigned, even if the account cancels.
- Commission revenue is always calculated net of broker costs. Furthermore, any broker relationships must be approved by a Regional Vice President.
- Any new commercial account producing below $750 in revenue may be assigned to the small business unit if available. **Producers will not be paid on new or renewal accounts with less then $750 of revenue.** The account will be assigned to a producer outside of the small business unit when revenue reaches more then $1000 in revenue.
- Over rides, contingency, retention bonus, persistency bonus etc. or any other additional commission paid by the company will not be included as commission income and will not be included as new or renewal income for payment to the account executive.

| Producer Classification | Previous year revenue production | Percentage paid |
|---|---|---|
| Level 1 | $0-499,999 | 28% |
| Level 2 | $500,000+ | 30% |

**New business commission:**

- For all new business producers will be paid an additional 10% for the first year only.
- New business is defined as a bound insurance policy where the business or individual has not placed insurance coverage for the same type of policy i.e. property, d and o, liability etc. with hub international within the last twelve months.
- Producers are only paid on accounts that produce more then $750 in revenue.

**Commission splits:**

- Joint sales between producers (two commercial P&C account executives or two group benefit account executives) may be split as determined by producers for new and renewals. Commission will only be credited toward one producer for producer classification. Commission will not exceed that which would be paid for a single producer. Producers must be properly licensed to receive commission and will not be paid on insurance for which they are not licensed.
- Any employee benefits account producing below $1000 in revenue may be assigned to the small business unit if available. **Producers will not be paid on new accounts with less then $750 of revenue.** The account will be assigned to a producer outside of the small business unit when revenue reaches more then $1000 in revenue.

- Overrides, contingency, retention bonus, persistency bonus etc. or any other additional commission paid by the company will not be included as commission income and will not be included as new or renewal income for payment to the account executive.
- Group benefit referrals will pay 10% commission first year for commercial account executives.
- Commercial P&C referrals will pay 10% commission first year for group benefit account executives.
- All commission split business will count toward new business goals for the lead and will only be credited toward lead producer for hub international producer recognition.

**Cancellation of accounts and charge back of commission:**

There should be no charge backs in this line of business. However, if this occurs we will utilize the provisions outlined for the Commercial P and C producer and if this does not resolve to management's discretion further determination will be made by management.

**Calculation of Draw:**

Current year base draw will be 80% of prior year commission. This can be adjusted by the regional vice president upward by 10%, to 90% but above that amount will require president approval. The draw can be adjusted downward without limits by the regional vice president.

Commission will be trued up every three months and will be normally paid in the second pay check following the end of the period.

**Sample:**

Jim's 2005 total commission generated is $400,000 and thus determined to be a level 1 producer. He produces $450,000 of revenue in 2006. Thus he is paid $126,000. In addition, $70,000 of the $450,000 is determined to be "new business" and thus he is paid 10% of the $70,000 or $7,000. The total payment is $133,000.

**Section III Continued**
**Plan Compensation by position**

---

**Employee Benefits Account Managers**

**Description:** Senior Account Managers are paid for further cross sales of additional products and services deemed to be new business to an account that they have sole responsibility for servicing and maintaining or new clients they prospect and sell while in the position of Senior Customer Service Agent.

Payment of Commission:

In addition to the salary that is paid to this position, the individual has the following opportunity to earn commission based on the following formula:

Compensation paid as a percentage of first year gross commission earned – 20%.

New business is defined as a bound insurance policy where the business or individual has not placed insurance coverage for the same type of policy i.e. property, d and o, liability etc. with hub international within the last twelve months. No other producer may be paid commission on this policy or no sharing of commission may occur on this policy for the 20% to be paid.

**Sample calculation:**

Jim is working as a Senior Customer Service Agent and sold one additional policy on the plans he services. The revenue from the account is $2,000 and thus he is paid $400.

Section IV Incentive Payment Schedule

A. General

Payment of commissions above draws will occur once quarter for commercial and employee benefit account executives. Personal lines personnel will receive payment incentive monthly but may be changed to quarterly at management's discretion. Adjustment of draws upward or downward can occur at any time based on regional vice president's authorization and Hub Southwest President approval.

B. Incentive Payment under Special Circumstances

If any provision of this section violates local, state or federal law, the applicable law shall control.

1. Voluntary or Involuntary Termination. If Employee's employment is voluntarily or involuntarily terminated, Employee is not entitled to receive continued commission payment.

2. Transfer. If Employee transfers to another position within Hub that does not participate under this Plan. Employee will be paid compensation based on year to date performance and earned commission with management having final say on amounts to be paid. .

3. Leave of Absence. Executive management, which has approved this incentive plan. will have final approval for any bonus payment on individuals that exercise a leave of absence.

4. Death. In the event of Employee's death, Employee's Bonus Payment will be calculated based on earned commission.

Section V. Effective Date of the Plan

Unless otherwise specified, the bonus plan is effective January 1, 2008 through December 31, 2008.

Section VI. Administration

A. Withholding Taxes

Hub shall deduct from Employee's compensation an amount necessary to satisfy Employee's federal. state and local tax withholding requirements. Employee will be responsible for any applicable taxes.

B. Intent of the Plan

The Plan was developed to reward eligible participants for meeting and exceeding goals and objectives. In the event the plan operation or plan terms cause an unanticipated or unintentional result in the amount, duration or structure of incentive payments made under the plan, Hub retains the absolute and unconditional right at all times to increase, decrease or terminate the amount of any and all bonus payment to be paid under the plan.

C. Entitlement of Plan Benefits

In administering the plan, and in conjunction with the stated provisions of the "intent of the plan". Hub reserves the right to change or delete the functional assignments, increase and or modify participant and/or plan goals and performance objectives, and accept or reject accounts and business opportunities as Hub in its sole discretion determines to be in its best interest. As a condition to participating in the plan, the participant acknowledges Hub's reservation of rights to change, modify or terminate the plan without notice and has no further obligation to participant. Furthermore, the participant maintains no present interest in or entitlement to plan benefits other than those determined by Hub to be payable under the terms of the plan for which payment is or will be paid.

**D. Continuing Eligibility**

Continuing eligibility of participants is determined through the Plan sponsor. It is expected that all participants have a satisfactory performance or above to be considered for incentive pay out.

**E. Responsibilities for Calculations and Plan Payments**

The Plan administrator will be the Chief Financial Officer and Controller of the agency and is responsible for calculating, authorizing and submitting bonus payments with plan sponsor approval.

The plan administrator is responsible for all plan calculations and record keeping. The plan sponsors will have 1) final approval on all payouts, 2) final say on any and all discrepancies and inconsistencies, and 3) the authority to modify the plan at any time.

**F. Conflicting Documents**

If there is a conflict in the description of the plan, its awards and benefits, between this plan document and any other document management reserves the right to make adjustments to this or any other bonus plan.

If anything in this plan conflicts with the Human Resources Policy Manual, the terms of this plan shall control unless otherwise specified in this Plan.

**G. Amendment and Termination**

Hub reserves the right to amend or terminate this plan at any time, for any reason.

**H. Assignment of Incentive Awards**

No benefits received under the Plan shall be subject to transfer, assignment, or encumbrance in any manner, either by the participant or any other person. Any attempt by the participant to assign his or her benefit shall result in the participant's forfeiture of such Plan benefits.

**I. Interest in Plan Awards**

With respect to payments of awards under the Plan, participants shall have rights against the Hub only as general, unsecured creditors.

**J. New Employees**

Compensation guarantees and deviations from this plan can be utilized at management discretion to attract new employees or retain existing employees. No compensation can be offered as a condition of employment without approval from the president of the agency.

**K. Benefits**

Benefits which are valued and or determined as a result of compensation such as the 401(k) match and life insurance coverage as a percentage of compensation are covered under separate documents and those documents apply to amounts and types of coverage available and offered to plan participants. Those documents govern when determining final benefits amounts.

**Section VII. Non-Solicitation**

In return for the benefits Employee receives under this Plan, Employee agrees that during the term of employment and for two years from Employee's voluntary termination of employment Employee will not: (1) directly or indirectly influence or advise any other person to employ or solicit for employment anyone who is employed by Hub on the date of Employee's separation; (2) directly or indirectly influence or advise any person who is or shall be in the service of Hub to leave the service of Hub; (3) use any of the information or business secrets used by Hub; (4) disclose the proprietary methods of conducting the business of Hub; (5) make any statement or take any actions that may interfere with Hub's business relationship with Hub's customers; (6) attempt to divert any of the business of Hub or any business which Hub has a reasonable expectation of obtaining by soliciting, contacting, or communicating with any customers and/or potential customers which have been derived from leads or lists developed and delivered to Employee by Hub.

If Employee has executed another non-compete, non-solicitation or employment contract with Hub, the terms of that agreement are incorporated herein by reference and shall remain in full force and effect. If any of the terms of this Section conflict with Employee's other non-compete or non-solicitation agreement, the terms of Employee's other agreement shall control.

**Section VIII. Confidentiality**

In consideration of being employed by Hub, Employee agrees that during and following employment with Hub, Employee will hold in strictest confidence and will not disclose to anyone any information concerning:

1. The business or affairs of a current, past or prospective customer of Hub.
2. The development of any product, device or invention of Hub, including pricing strategy, marketing strategy, marketing and sales focus.
3. Any list or information from the company in all forms including, hand written, digital, memorized or from memory, or any other form of customer information.
4. Any information concerning Hub or its operations not readily available to the public, unless expressly authorized by the President of Hub International Southwest or any legal entity which is defined as a part of Hub International Southwest.

Employee further agrees that all rights, title and interest to any product, device, invention, or enhancement to a product or service, developed during employment with Hub and using Hub resources or know-how, shall belong exclusively to Hub. Employee agrees to execute any documents necessary to reflect Hub's exclusive ownership in such items.

Upon termination of employment with Hub, Employee will deliver to Hub all documents, notes, materials and all copies thereof, relating to the operations of the business of Hub and its customers.

**Section IX. At-Will Employment**

All positions at Hub are at-will unless outlined in separate contract and or document and this bonus/incentive plan should not be construed as a contract of employment. Employee or Hub can end employment for any legal reason or no reason at any time. Nothing in this Plan shall be construed to modify Employee's at-will status.



## Acknowledgement For

I have received, read and understand the terms and conditions of the 2008 Incentive Compensation. I acknowledge that I am an at-will employee as defined by the Plan, unless outlined under separate contract, and agree to the terms and conditions of this Plan. I also acknowledge that Employer in its discretion may amend, modify, or terminate this bonus Plan.

1/7/08 (Date) [signature] (Signature)

Charles A. Birk III (Print Name)

Date ____________ Signature of Hub Management ____________

Print Name ____________




2008 Incentive/Bonus Compensation Plan
Hub International Southwest

Upon receipt of final approvals, the attached incentive plan will be implemented effective January 1, 2008.

Approved: ______________________________ Date: __________
Roy Taylor, CEO Hub International Southwest

Approved: ______________________________ Date: __________
Roger Forystek, President Hub International Southwest

Approved: ______________________________ Date: __________
Lisa Rister, CFO Hub International Southwest