**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **CHARLES BIRK,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **HUB INTERNATIONAL SOUTHWEST** | § | |
| **AGENCY LIMITED,** | § | |
| | § | |
| **Defendant.** | § | |
| _____ | § | |
| | § | |
| **HUB INTERNATIONAL SOUTHWEST** | § | |
| **AGENCY LIMITED,** | § | |
| | § | |
| **Counter-Plaintiff and Third-Party** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-08-CA-259-FM** |
| | § | |
| **CHARLES BIRK,** | § | |
| | § | |
| **Counter-Defendant,** | § | |
| | § | |
| **and CD LEE BRITTON INSURANCE** | § | |
| **AGENCY, LLC,** | § | |
| | § | |
| **Third-Party Defendant.** | § | |
| _____ | § | |

## ORDER RULING ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT REGARDING THE VALIDITY OF ANY NON-SOLICITATION AGREEMENT

On this day, the Court considered Charles Birk's ("Plaintiff") "Plaintiff's Motion for Partial

Summary Judgment" [Rec. No. 18], filed October 28, 2008; CD Lee Britton Insurance Agency, LLC's

("Third-Party Defendant") "Third[-]Party Defendant's Motion for Summary Judgment" [Rec. No. 23],

filed November 18, 2008; Hub International Southwest Agency Limited's ("Defendant") "[Defendant]'s

Cross-Motion for Partial Summary Judgment and Response to Plaintiff's Motion for Partial Summary

Judgment" [Rec. No. 25], filed November 24, 2008; "[Defendant]'s Response to Third-Party Defendant's

Motion for Summary Judgment" [Rec. No. 26], filed December 3, 2008; "Plaintiff's Response to

[Defendant]'s Cross-Motion for Partial Summary Judgment and Reply to [Defendant]'s Response to Plaintiff's Motion for Partial Summary Judgement" ("Plaintiff's Response") [Rec. No. 27], filed December 8, 2008; and "[Defendant]'s Reply in Support of Its Cross-Motion for Partial Summary Judgment" ("Defendant's Reply") [Rec. No. 29], filed December 22, 2008. The parties request the Court to resolve whether Plaintiff entered into a valid non-solicitation agreement with Defendant.

## I.      <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

On June 3, 2008, Defendant sent Plaintiff a letter requesting Plaintiff to cease and desist from soliciting Defendant's customers, in violation of an alleged non-solicitation agreement executed by Plaintiff and Defendant. In the letter, Defendant demanded Plaintiff pay $6800 in damages resulting from Plaintiff's alleged solicitation of Defendant's clients. On June 11, 2008, Plaintiff filed his "Original Petition" in the 34th Judicial District Court of El Paso County, Texas, requesting the state court to enter a declaratory judgment declaring Plaintiff was not subject to any non-solicitation agreement with Defendant.

Plaintiff subsequently filed his First Amended Petition ("Amended Petition") on July 1, 2008, in which Plaintiff specifically requested the state court to

> enter a declaratory judgment that [Plaintiff] is not subject to any non-compete or non-solicitation agreement with [Defendant], that [Plaintiff] is free to compete and pursue gainful employment as he sees fit, that [Plaintiff] is entitled to contact, solicit[,] and obtain the business of any person or entity, including current or former clients of [Defendant], . . . that any purported non-solicitation obligations of [Plaintiff] under . . . [any agreement] are void and not enforceable in Texas under the facts and circumstances of this case, and that [Defendant] has no viable claim against [Plaintiff], including any matter arising after the termination of his employment by [Defendant].

Pursuant to 28 U.S.C. § 1446(b), Defendant timely removed this matter to federal court based upon diversity jurisdiction. Plaintiff filed his "Motion to Remand" [Rec. No. 4], on August 8, 2008. On September 11, 2008, the Court denied Plaintiff's Motion to Remand [Rec. No. 11].

On September 2, 2008, Defendant filed "Defendant's Answer and Affirmative Defenses to Plaintiff's First Amended Petition, Counterclaim, and Third-Party Complaint" [Rec. No. 9]. Therein,

Defendant asserts a counterclaim for breach of contract against Plaintiff for violating a non-solicitation agreement Defendant alleges it entered into with Plaintiff. Defendant alleges a third-party claim against Third-Party Defendant, claiming tortious interference with a contract. Defendant requests the Court to enjoin Plaintiff from soliciting its customers and to enjoin Third-Party Defendant from interfering with Plaintiff and Defendant's non-solicitation agreement.

On September 22, 2008, Plaintiff answered Defendant's counterclaim in "Plaintiff's Reply to Defendant's Counterclaim" [Rec. No. 12]. Plaintiff asserts the invalidity of any non-solicitation agreement as a defense. On September 24, 2008, Third-Party Defendant answered Defendant's Third-Party claim in "Third-Party Defendant's Answer to Third Party-Complaint [Rec. No. 14]. Third-Party Defendant also asserts the invalidity of any non-solicitation agreement as a defense.

On October 29, 2008, in response to the Court's September 29, 2008, Order for the parties to confer and submit a proposed Scheduling Order, the parties filed a proposed Scheduling Order, which requested the Court to set a November 24, 2008, deadline for filing any motions regarding the enforceability of any non-solicitation agreement between Plaintiff and Defendant. The Court granted the parties' request and the parties filed the instant summary judgment motions in accordance with the November 24, 2008, deadline.

Pursuant to the Court's Scheduling Order, Plaintiff filed "Plaintiff Charles Birk's Second Amended Complaint Against Hub International Southwest Agency[] [Limited]" ("Second Amended Complaint") [Rec. No. 42] on January 22, 2009. Third-Party Defendant filed its "Third[-]Party Defendant's Counterclaim Against Third[-]Party Plaintiff Hub International Southwest Agency Limited" ("Third-Party Defendant's Counterclaim") [Rec. No. 41] on January 22, 2009. Defendant filed "Defendant's Answer and Affirmative Defenses to Plaintiff's Second Amended Petition" [Rec. No. 45] and "Third-Party Plaintiff's Answer and Affirmative Defenses to Third-Party Defendant's Counterclaim" [Rec. No. 46] on February 17, 2009. Plaintiff's Second Amended Complaint and Third-Party Defendant's Counterclaim seek the same declaratory relief, which is the subject of the instant motions for

summary judgment. Plaintiff also alleges promissory estoppel.[1] Defendant denies promissory estoppel applies.[2]

## II.  PARTIES' STATEMENT OF THE FACTS AND ARGUMENTS

### A.  Statement of the Facts

In 1987, Plaintiff became an independent agent with the Gillett Insurance Agency ("Gillett"), with whom he worked until 2002.[3] For six years prior to his employment with Gillett, Plaintiff worked for Samford Greve & Perry as an insurance agent.[4] In 2002, Gillett was acquired by an entity related to the Talbot Agency, Inc. ("Talbot").[5] On November 1, 2002, Plaintiff executed a non-solicitation agreement with Talbot ("Talbot Agreement").[6] According to Plaintiff, Talbot did not recite or pay any consideration to Plaintiff in exchange for Plaintiff's execution of the Talbot Agreement.[7]

Defendant contends it was at this time, when Defendant was called "Talbot," that Plaintiff began his employment with Defendant.[8] Defendant also avers when Plaintiff began his employment with Talbot, Plaintiff entered a non-solicitation agreement with Talbot, which barred Plaintiff from soliciting any of Talbot's customers for two years after termination of his employment with Talbot.[9] The Talbot Agreement provided Plaintiff would be required to pay twice the annual commissions of any clients he

---

[1] Pl.'s 2d Am. Compl. ¶¶ 29-32.

[2] Def.'s Answer 2d Am. Compl. ¶ 31.

[3] Pl.'s Mot. Summ. J. ¶ 2.

[4] Pl.'s 2d Am. Compl. ¶ 7.

[5] Pl.'s Mot. Summ. J. ¶ 2.

[6] *Id.*

[7] *Id.*

[8] Def.'s Cross-Mot. Summ. J. at 3.

[9] *Id.*

diverted from Talbot.[10]  Defendant states the Talbot Agreement also contained a non-disclosure

agreement, which required Plaintiff not to reveal any of Talbot's confidential information.[11]  According

to Defendant, the non-disclosure agreement was part of the non-solicitation agreement.[12]

While working for Talbot, Plaintiff states he received 35% of the commissions he generated from

the clients he serviced.[13]  This included commissions from new and existing policies.[14]  Plaintiff avers

Talbot also matched its employees on a dollar for dollar basis, up to 6% of their salaries as part of its

401(k) program.[15]  According to Defendant, after Plaintiff began working for Defendant, when

Defendant's name was Talbot, Plaintiff received access to its confidential information.[16]  Defendant

contends Plaintiff had access to confidential customer lists; customer policy numbers; customer policy

coverages; expirations of policies; customer-payroll and workforce data; details regarding customers'

liabilities; premium sums on existing policies; and market details for existing customers and prospects.[17]

In July 2004, Plaintiff states the parent corporation of Talbot was acquired by an entity related to

Defendant.[18]  Defendant avers it is a subsidiary of Hub International Limited ("Hub International").[19]

Defendant states prior to 2004, Talbot Financial Corporation ("Talbot Financial") was a holding

---

[10] *Id.*

[11] *Id.* at 4.

[12] *Id.*

[13] Pl.'s Mot. Summ. J. ¶ 2.

[14] *Id.*

[15] *Id.*

[16] Def.'s Cross-Mot. Summ. J. at 4.

[17] *Id.*

[18] Pl.'s Mot. Summ. J. ¶ 3.

[19] Def.'s Cross-Mot. Summ. J. at 2.

company for insurance brokerages and was the parent company of Talbot.[20]  Defendant declares in July

2004, Hub International, its parent, purchased Talbot Financial from Safeco Corporation ("Safeco").[21]

According to Defendant, Hub International paid a sum greater than $90 million in cash to acquire the

accounts of the Talbot entities, including Talbot.[22]

Following this acquisition, Defendant avers Talbot changed its name to "Hub International

Southwest Agency Limited."[23]  Subsequently, Defendant claims it remained a viable insurance brokerage

operating under the name of "Hub International Southwest Agency Limited," rather than the name of

"Talbot."[24]  According to Defendant, when the name-change occurred, it retained Talbot's federal

employer identification number ("EIN").[25]

At this time, Plaintiff claims his terms of employment changed.[26]  Plaintiff avers he was required

to execute annual employment agreements ("HUB Agreements") with Defendant.[27]  Pursuant to the HUB

Agreements, Plaintiff received 38% of the commissions he generated from new business, but received

only 28% of the commissions he generated from renewed policies.[28]  The 401(k) matching program

changed, as well, and Plaintiff received only 60% of each dollar he set aside, up to 6% of his salary.[29]

For client policies that generated less than $500 per year, Defendant eliminated any commission

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.* at 2-3.

[25] *Id.* at 3.

[26] Pl.'s Mot. Summ. J. ¶ 3.

[27] *Id.*

[28] *Id.*

[29] *Id.*

compensation.[30]  According to Plaintiff, Plaintiff and Defendant operated under the HUB Agreements from year to year, and the Talbot Agreement was never mentioned.[31]  Defendant asserts that after Talbot changed its name, Plaintiff still had access to its confidential information.[32]  Plaintiff declares he never executed any other agreements but the annual agreements with Defendant.[33]

On April 8, 2008, Defendant terminated Plaintiff's employment.[34]  Plaintiff's termination was not voluntary.[35]  At the time he was terminated, according to Plaintiff, his "book of business" consisted of a clientele he had cultivated when he worked for Gillett, before Gillett was acquired by Talbot.[36]  After Defendant terminated Plaintiff, he received a letter from Defendant stating he was subject to the solicitation bar in the Talbot Agreement.[37]  On June 3, 2008, Plaintiff received a letter from a Chicago law firm, which also stated Plaintiff was subject to the solicitation bar in the Talbot Agreement.[38]  The letter stated Plaintiff had interfered with and solicited at least one of Defendant's clients and demanded $6800 in payment, which represented two times the annual commission of the client's policy.[39]  As a result of the letter, Plaintiff filed the instant action.[40]

---

[30] *Id.*

[31] *Id.*

[32] Def.'s Cross-Mot. Summ. J. at 4.

[33] Pl.'s 2d Am. Compl. ¶ 13.

[34] Pl.'s Mot. Summ. J. ¶ 4.

[35] *Id.*

[36] *Id.*

[37] *Id.* ¶ 5.

[38] *Id.* ¶ 6.

[39] *Id.*

[40] *Id.* ¶ 7.

B.    *Statement of the Arguments*

1.    Summary of the Arguments

Plaintiff contends the HUB Agreements superseded the Talbot Agreement, and therefore, the HUB Agreements are the operative agreements.[41]  He argues the non-solicitation provision in the HUB Agreements does not apply because he did not voluntarily terminate his employment with Defendant.[42]  Plaintiff asserts that even if the Talbot Agreement was operative, the non-solicitation and double damages provisions of it are invalid and unenforceable as a matter of Texas law.[43]  Plaintiff contends the Talbot Agreement is unenforceable because it lacks consideration and is not ancillary to or part of an otherwise enforceable agreement.[44]  Plaintiff argues the Talbot Agreement is not reasonable pursuant to Texas law and is therefore unenforceable.[45]  Accordingly, Plaintiff requests the Court to enter a declaratory judgment stating Plaintiff is not subject to any non-solicitation agreement; Plaintiff is entitled to freely compete in the insurance industry and solicit and do business with any entity; and Defendant is not entitled to any of its requested relief.[46]  Third-Party Defendant adopts the argument and reasoning of Plaintiff.[47]

Defendant characterizes its enforcement of the Talbot Agreement as its "fundamental right to protect its customer accounts, relationships, and goodwill that its parent company purchased[,] and in which it heavily invests[,] from unauthorized and unfair solicitation from former employees."[48]

---

[41] *Id.* ¶ 9.a.

[42] *Id.* ¶ 9.b.

[43] *Id.* ¶ 9.d.

[44] *Id.* ¶ 9.e.

[45] Pl.'s Resp. ¶ 10.

[46] Pl.'s Mot. Summ. J. ¶ 19.

[47] Third-Party's Mot. Summ. J. ¶ 3.

[48] Def.'s Cross Mot. Summ. J. at 1.

Defendant contends Plaintiff is attempting to nullify his promise to refrain from soliciting Defendant's customers or to refrain from utilizing Defendant's confidential information.[49] Defendant argues Talbot and Defendant are the same entity; the Talbot Agreement is enforceable; Plaintiff received consideration for his execution of the Talbot Agreement; and Defendant is entitled to compensation for Plaintiff's violations of the Talbot Agreement.[50]

### 2. Specific Arguments

#### a. Whether a Novation Occurred

Plaintiff argues the HUB Agreements superseded the Talbot Agreement because the HUB Agreements changed the terms and conditions of his employment.[51] Pursuant to the HUB Agreements, Plaintiff argues he was only subject to a solicitation bar if Plaintiff voluntarily terminated his employment with Defendant.[52] Because Plaintiff did not voluntarily terminate his employment with Defendant, he contends the non-solicitation covenant in the HUB Agreements does not apply.[53]

Plaintiff notes Defendant does not dispute that Defendant terminated Plaintiff's employment involuntarily, nor does Defendant contest that the solicitation bar in the HUB Agreements only applies upon voluntary termination of Plaintiff's employment.[54] Defendant in fact admits it terminated Plaintiff's employment on April 8, 2008.[55] Plaintiff also notes Defendant never disputes the Talbot Agreement was not mentioned during his employment with Defendant after Defendant changed its

---

[49] *Id.*

[50] *Id.* at 5.

[51] Pl.'s Mot. Summ. J. ¶¶ 9.a, 12.

[52] *Id.* ¶ 11.

[53] *Id.* ¶ 9.b.

[54] Pl.'s Resp. ¶ 2.

[55] Def.'s Answer 2d Am. Comp. ¶ 11.

name.[56]  Plaintiff argues Defendant cannot rely upon the Talbot Agreement when it has been operating

pursuant to the HUB Agreements with respect to Plaintiff's terms of employment.[57]

Therefore, Plaintiff asserts any contention Defendant makes regarding the Talbot Agreement is

irrelevant.[58]  Plaintiff contends any previous non-compete or non-solicitation agreement it may have

entered with Talbot has nothing to do with the subsequent non-solicitation provisions in the HUB

Agreements because Defendant was not a party to the Talbot Agreement.[59]  Rather, Plaintiff argues any

obligations he had pursuant to the Talbot Agreement ended two years after his employment with Talbot

terminated.[60]  Plaintiff contends Defendant cannot now rely on the Talbot Agreement, having changed

the terms of Plaintiff's employment and received the benefit of its bargain.[61]

Defendant, however, argues Talbot and it are the same legal entity.[62]  Defendant states its parent,

Hub International, purchased stock in Satellite Acquisition Corporation ("Satellite"), and Satellite

subsequently purchased Talbot's parent, Talbot Financial.[63]  Defendant contends Talbot remained the

same insurance brokerage, but it changed its name to "Hub International Southwest Agency Limited."[64]

Defendant argues the compensation plans executed after Talbot changed its name to "Hub

International Southwest Agency Limited" reflect Plaintiff's renewed promise not to solicit Defendant's

---

[56] Pl.'s Resp. ¶ 2.

[57] Pl.'s Mot. Summ. J. ¶ 9.c.

[58] *Id.* ¶ 13.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] Def.'s Reply ¶ 4.  Notwithstanding this argument, the letter sent by the Chicago law firm to Plaintiff on June 3, 2008, calls Talbot a "predecessor" to Defendant.

[63] *Id.*

[64] *Id.*

clients upon Plaintiff's voluntary termination of his employment with Defendant.[65]  According to Defendant, a company who changes its name is still considered a party to its contracts and may enforce such contracts.[66]  Defendant contends the subsequent HUB Agreements do not replace Plaintiff's obligation to comply with the Talbot Agreement because the non-solicitation restriction provisions in the HUB Agreements incorporate the Talbot Agreement.[67]  Therefore, Defendant asserts it may enforce the Talbot Agreement because it is Talbot, and it is permitted to enforce its own agreements.[68]

Plaintiff contends when Talbot's name changed to "Hub International Southwest Agency Limited," the change was more than simply a "name-change" because the terms of his employment changed.[69]  Plaintiff argues Talbot became a part of an international company, which had its headquarters in Chicago and for which the new regional manager worked out of Denver, Colorado.[70]  Plaintiff contends he was required to enter into direct agreements with Defendant.[71]  According to Plaintiff, "[w]hen the actual transaction is examined, it is apparent that through their respective parent corporations, Hub International acquired the Talbot holding company, and that all of its subsidiaries were acquired by Hub International, including Hub Southwest."[72]

Plaintiff argues the information on Defendant's website shows the name-change from "Talbot" to "Hub International Southwest Agency Limited" is a red herring.[73]  Plaintiff points to various web pages

---

[65] Def.'s Cross-Mot. Summ. J. at 4-5.

[66] *Id*. at 5.

[67] *Id*. at 5, 10; Def.'s Reply ¶ 5.

[68] Def.'s Cross-Mot. Summ. J. at 6.

[69] Pl.'s Resp. ¶ 13.

[70] *Id*.

[71] *Id*.

[72] *Id*.

[73] *Id*. ¶ 14.

from Defendant's website to show Plaintiff's actual employer did change when Talbot was acquired by Defendant.[74]  Plaintiff relies upon press releases from Defendant's parent's website to demonstrate the change was more than a name-change.[75]  Based upon this information, Plaintiff contends when Talbot was acquired by Defendant through the acquisition of Talbot Financial, Plaintiff's employer changed from Talbot to Defendant.[76]

Furthermore, Plaintiff argues Defendant's assumption of Talbot's EIN is of no consequence.[77]  Plaintiff contends Defendant's continued use of Talbot's EIN number is a matter between the Internal Revenue Service ("IRS") and Defendant and is not conclusive evidence regarding whether Plaintiff's employer changed from Talbot to Defendant after Talbot was acquired by Defendant.[78]  Plaintiff argues what is of consequence is that Talbot was acquired by Defendant; Defendant changed the terms and conditions of the employment relationship with Plaintiff; and Plaintiff executed annual HUB agreements.[79]

Therefore, Plaintiff asserts he became Defendant's employee, with whom he executed the annual HUB Agreements, not the Talbot Agreement.[80]  According to Plaintiff, the HUB Agreements subjected Plaintiff to a solicitation bar if Plaintiff voluntarily terminated his employment with Defendant.[81]  Plaintiff contends that he is entitled to rely on the HUB Agreements, and that Defendant cannot rely upon

---

[74] *Id.*

[75] *Id.* ¶ 15.

[76] *Id.* ¶ 16.

[77] *Id.*

[78] *Id.* ¶ 14.

[79] *Id.* ¶ 16.

[80] *Id.*

[81] *Id.*

the old Talbot Agreement.[82]

Defendant, on the other hand, states having the same EIN it had when it was called "Talbot" is not a red herring, but rather shows Defendant and Talbot are the same company.[83] Defendant contends the website information Plaintiff presents, aside from being unauthenticated, lacking in foundation, and being inadmissible hearsay, demonstrates Satellite, not Hub International, purchased Talbot's parent.[84] Nonetheless, Defendant contends the handouts are inadmissible.[85]

### b. Whether the Non-Solicitation Agreement Is Legally Enforceable

Plaintiff contends even if the Talbot Agreement was still in effect and Defendant is a party to it, the Talbot Agreement is unenforceable pursuant to Texas law.[86] Plaintiff argues the non-solicitation and double damages provisions of the Talbot Agreement constitute a restraint on trade, which is invalid or unenforceable under Texas law because it is (1) not supported by consideration; (2) not part of or ancillary to another valid agreement; and (3) does not meet the requirements of reasonableness for such an agreement.[87] Defendant contends its non-solicitation agreement is subject to the same analysis as a covenant not to compete and is therefore valid pursuant to Texas law.[88]

### i. Whether There Is Any Consideration for Any Non-Solicitation Agreement

Plaintiff contends the Talbot Agreement fails as a matter of Texas law because it does not recite any consideration provided to Plaintiff in exchange for Plaintiff's execution of the Talbot Agreement, nor

---

[82] *Id.*

[83] Def.'s Reply ¶ 7.

[84] *Id.* ¶¶ 2, 6.

[85] *Id.* ¶ 6.

[86] Pl.'s Mot. Summ. J. ¶ 14.

[87] *Id.* ¶¶ 9.d-e; Pl.'s Resp. ¶¶ 1, 10-12.

[88] Def.'s Cross-Mot. Summ. J. at 6.

was there any actual exchange of required mutual consideration.[89]  Furthermore, Plaintiff argues there

was no independent or other consideration promised or provided to Plaintiff for his execution of the non-

solicitation provision in the HUB Agreements.[90]  As outlined below, Defendant contends it gave Plaintiff

confidential information, which served as an acceptance of Plaintiff's promise not to disclose such

information, giving rise to a unilateral contract and thus making the non-solicitation agreement ancillary

to or part of an otherwise enforceable agreement.

ii. Whether Any Non-Solicitation Agreement Is Ancillary to or Part
  of An Otherwise Enforceable Agreement

Plaintiff contends the non-solicitation provision was not ancillary to or otherwise part of an

otherwise enforceable agreement, for which valid consideration was promised or exchanged.[91]  Plaintiff

notes there was no binding promise or obligation in the Talbot Agreement requiring Talbot to provide

confidential information or training to Plaintiff, nor did Defendant provide any other consideration for

the non-disclosure agreement.[92]  Therefore, Plaintiff contends the non-disclosure provision of the Talbot

Agreement is invalid and cannot be an otherwise enforceable agreement.

Defendant argues a non-disclosure agreement is an "otherwise enforceable agreement" for the

purpose of validating the non-solicitation covenant.[93]  Hence, Defendant contends the non-solicitation

covenant was ancillary to or part of the non-disclosure agreement within the Talbot Agreement.[94]

Defendant asserts that when it provided Plaintiff access to confidential information, Plaintiff received

confidential information, and had access to network systems containing information related to

---

[89] Pl.'s Mot. Summ. J. ¶ 10; Pl.'s Resp. ¶¶ 1, 4-7.

[90] Pl.'s Mot. Summ. J. ¶ 15; Pl.'s Resp. ¶¶ 1, 4-7, 9.

[91] Pl.'s Mot. Summ. J. ¶ 15; Pl.'s Resp. ¶ 5.

[92] Pl.'s Mot. Summ. J. ¶¶ 10, 18; Pl.'s Resp. ¶¶ 1, 4-7.

[93] Def.'s Cross-Mot. Summ. J. at 7; Def.'s Reply ¶ 8.

[94] Def.'s Cross-Mot. Summ. J. at 8.

Defendant's customers and protected marketing materials, and therefore, a unilateral contract between Plaintiff and Defendant was formed.[95]  Defendant contends even if confidential information was not provided to Plaintiff at the time the non-disclosure agreement was executed, Defendant's subsequent provision of information to Plaintiff formed a valid unilateral contract with Plaintiff.[96]

Defendant argues Plaintiff's contention that there was no express promise in the Talbot Agreement to provide confidential information is unavailing because Texas law does not require express, bilateral promises between the parties.[97]  Instead, Defendant argues pursuant to Texas law an illusory promise can become enforceable as a unilateral contract when the promisor performs without any express promise.[98]  According to Defendant, its giving Plaintiff confidential information concerning one client is sufficient consideration for the non-disclosure agreement.[99]

Defendant contends it is irrelevant whether Plaintiff utilized confidential information to develop or obtain new clients because "the only thing of relevance is that he received confidential information regardless of how he made use of it," which would validate an otherwise enforceable agreement, i.e. the non-disclosure provision in the Talbot Agreement.[100]  Defendant argues Plaintiff had access to all of Defendant's El Paso clients, not just his own, through the Sagitta system.[101]  Defendant points out Plaintiff received information for more than thirty clients he developed separately from his twenty-one years of prior experience.[102]  Defendant also contends the solicitation bar is ancillary to or part of the

---

[95] *Id.*

[96] *Id.* at 7-8.

[97] Def.'s Reply ¶¶ 3, 8.

[98] *Id.* ¶ 9 (citation omitted).

[99] *Id.* ¶ 10.

[100] *Id.* ¶ 3.

[101] *Id.* ¶ 11.

[102] *Id.* ¶ 3.

non-disclosure agreement because the solicitation bar would prevent Plaintiff from utilizing confidential information to which he had access to solicit Defendant's customers.[103]

Plaintiff notes, on the other hand, Defendant did not dispute that Plaintiff's "book of business" had its origin prior to becoming an employee of Talbot in November 2002, and, therefore, the "confidential information" Defendant purports to have given Plaintiff was not "confidential" at all.[104] Plaintiff asserts Defendant cannot name any clients Plaintiff serviced as a result of confidential information or trade secrets Defendant provided Plaintiff.[105] Plaintiff states his clients may have acquired a new entity or changed their coverage over the years, but they originated prior to his association with Talbot.[106]

### iii.    Whether Any Non-Solicitation Agreement Is Reasonable

Plaintiff argues the Talbot Agreement is invalid under Texas law because it does not meet the statutory requirements of reasonableness for a valid non-solicitation agreement.[107] Plaintiff contends the solicitation bar is unreasonable because it prevents Plaintiff from dealing with Talbot clients who Plaintiff never serviced while he worked for Talbot.[108] Plaintiff contends the Talbot Agreement is also unreasonable because it has no geographic limitations.[109] Plaintiff argues such agreements, lacking any limitations, are broader than necessary and are therefore unenforceable.[110]

---

[103] Def.'s Cross-Mot. Summ. J. at 8.

[104] Pl.'s Resp. ¶ 3.

[105] *Id.*

[106] *Id.*

[107] *Id.* ¶ 10.

[108] *Id.*

[109] *Id.*

[110] *Id.* ¶¶ 11-12.

Defendant argues the non-solicitation restriction is reasonable in scope and duration.[111] According to Defendant, the Talbot Agreement "places no greater restraint than is necessary to protect [Defendant]'s customer relationships and goodwill."[112] Defendant contends the non-solicitation restriction is limited because its duration is only two years, and Defendant notes several Texas state courts and other federal courts have found two-year restrictions to be reasonable.[113] Defendant points out that Plaintiff cites no case law, which states a two-year non-solicitation agreement is per se overly broad.[114]

Contrary to Plaintiff's interpretation of the solicitation bar, Defendant asserts it only applies to the clients Plaintiff serviced while he worked for Defendant and is therefore limited.[115] According to Defendant, "Plaintiff remains free to work in the industry and do business with any other individual or entity."[116] Defendant argues no geographic restriction is necessary for the non-solicitation agreement to be valid.[117] Defendant contends the double damages provision of the non-solicitation agreement is not an invalid restraint of trade, and notes Plaintiff does not cite any Texas law, which supports his contention the covenant is an invalid restraint.[118]

## III.   **APPLICABLE LAW**

### A.        *Summary Judgment Standard*

Summary judgment should be granted only where "the pleadings, depositions, answers to

---

[111] Def.'s Cross-Mot. Summ. J. at 8.

[112] *Id.* at 8-9.

[113] *Id.* at 9.

[114] Def.'s Reply ¶ 11.

[115] Def.'s Cross-Mot. Summ. J. at 9 (stating "it is only applicable to the customers that Plaintiff served while at [Defendant]").

[116] *Id.*

[117] Def.'s Reply ¶ 11.

[118] Def.'s Cross-Mot. Summ. J. at 10.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[119] The party moving for summary judgment bears an initial burden of identifying those portions of the pleadings and any discovery on record, including any affidavits, which it believes demonstrate the absence of a genuine issue of material fact.[120] "If the moving party fails to meet this burden, the motion must be denied, regardless of the nonmovant's response."[121] If the movant does meet this burden, however, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.[122] "If the non-movant fails to meet this burden, then summary judgment is appropriate."[123]

When making a determination under Federal Rule of Civil Procedure 56, factual questions and inferences are viewed in a light most favorable to the nonmovant.[124] The party opposing a motion supported by evidence cannot discharge his burden by alleging mere legal conclusions.[125] Instead, the party must present affirmative evidence in order to defeat a properly supported motion for summary judgment.[126]

B.    *Choice of Law*

A federal court will apply the choice of law of the state in which it sits.[127] As a matter of course,

---

[119] FED. R. CIV. P. 56(c).

[120] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[121] *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

[122] *See Celotex*, 477 U.S. at 324.

[123] *Tubacex, Inc.,* 45 F.3d at 954.

[124] *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1272 (5th Cir. 1994).

[125] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986).

[126] *Id.*

[127] *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004) (citation omitted).

the Court will apply Texas choice-of-law principles to determine which state's law applies to any of the agreements the parties contend are operative.

When parties do not include a choice-of-law provision in their agreement, the Texas Supreme Court relies upon the most significant relationship test of the Restatement (Second) of Conflicts of Law ("Restatement Second") in order to determine which state's law applies.[128] Section 188 of the Restatement Second states

> [t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in [section] 6.[129]

The Texas Supreme Court relies on the Restatement Second's enumerated contacts to determine which state's law to apply.[130] Such contacts include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."[131]

Section 6 of the Restatement Second states

> the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.[132]

In reviewing what effect a contractual choice of law provision will be given, the Texas Supreme Court returned to Chief Justice Marshall's "'universal law . . . that, in every forum, a contract is governed

---

[128] *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 696 (Tex. 2002) (citing *Maxus Exploration Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 53-54 (Tex. 1991) (citation omitted)).

[129] RESTATEMENT (2D) OF CONFLICTS OF LAW § 188(1) (1971).

[130] *Henry Schein, Inc.*, 102 S.W.3d at 696 (citing *Maxus Exploration Co.*, 817 S.W.2d at 53).

[131] RESTATEMENT (2D) OF CONFLICTS OF LAW § 188(2).

[132] *Id.* § 6.

by the law with a view to which it was made.'"[133]  According to the Texas Supreme Court, "[t]he parties' understanding of their respective contractual rights and obligations depends in part upon the certainty with which they may predict how the law will interpret and enforce their agreement."[134]  The Texas Supreme Court has noted parties may include a choice of law provision in their contracts to avoid any uncertainty as to what law may apply.[135]  "Judicial respect for their choice advances the policy of protecting their expectations."[136]  The Texas Supreme Court notes, however, the parties' freedom to choose what jurisdiction's law will apply to their agreement cannot be unlimited."[137]  The Texas Supreme Court relies upon the Restatement Second to determine whether it will uphold parties' choice of law provisions in a contract.[138]

Specifically, the Texas Supreme Court applies Section 187 of the Restatement Second to determine if it will uphold the parties' choice of law provision.  Section 187(2) states

> [t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.[139]

---

[133] *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990) (citing *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 48, 6 L.Ed. 253 (1825)).

[134] *Id.* (citation omitted).

[135] *Id.*

[136] *Id.*

[137] *Id.*

[138] *Id.*

[139] RESTATEMENT (2D) OF CONFLICTS OF LAW § 187(2)(a)-(b).

According to the Texas Supreme Court, "whether [a] non[-]competition agreement . . . is enforceable . . . is not 'one which the parties could have resolved by an explicit provision in their agreement'"[140] Therefore, the Texas Supreme Court applies section 187(2) of the Restatement Second to determine what law should apply to determine whether a non-competition agreement is valid.[141]  Because Texas state courts undertake the same analysis to determine the validity of a non-solicitation agreement as they do a non-competition agreement,[142] the Court will apply section 187(2) to determine what law will apply to discern the validity of any non-solicitation agreement, where there is a choice-of-law provision.[143]

       1.       <u>Choice of Law for the HUB Agreements</u>

The HUB Agreements have no choice-of-law provision.  Therefore, in order to determine which state's law to apply to construe the HUB Agreements, the Court must evaluate to which state the parties and the transaction have the most significant relationship.[144]  The likely choices here are New Mexico and Texas.

Plaintiff entered into the HUB Agreements while he was an employee at Defendant's El Paso, Texas office.[145]  Based upon the parties' statements, few to no contractual negotiations took place between Plaintiff and Defendant, and it appears as though Plaintiff's employment was contingent upon executing the annual HUB Agreements.[146]  Plaintiff worked in El Paso, Texas, and therefore the performance of his duties occurred in Texas.[147]  Plaintiff states his clients were from New Mexico and

---

[140] *DeSantis*, 793 S.W.2d at 678 (citing RESTATEMENT (2D) OF CONFLICTS OF LAW § 187 comment d).

[141] *Id.*

[142] *See Miller Paper Co. v. Roberts Paper* Co., 901 S.W.2d 593, 600 (Tex. App. 1995) (no writ).

[143] *See DeSantis*, 793 S.W.2d at 678.

[144] *See Henry Schein, Inc.*, 102 S.W.3d at 696 (citing *Maxus Exploration Co.*, 817 S.W.2d at 53).

[145] *See* RESTATEMENT (2D) OF CONFLICTS OF LAW § 188(2)(a).

[146] *See id.* § 188(2)(b).

[147] *See id.* § 188(2)(c).

Texas.[148]  Plaintiff is a domiciliary of Texas, while Defendant is a domiciliary of New Mexico.[149]  Both parties argue Texas law applies.

The needs of the interstate system militate in favor of the application of Texas law.  Parties who operate wholly within a state, while doing business with customers outside of the state, for a corporation who is incorporated outside of the state, need to know which law will apply to their operations.[150]  Texas law supports non-solicitation agreements as long as they are reasonable and ancillary to or part of an otherwise enforceable agreement in order to prevent undue restraints on trade.[151]  New Mexico has a similar interest in ensuring non-solicitation agreements do not place any undue burdens or restraints on trade.[152]  Based upon the parties' arguments, which invoke Texas law, the parties' expectations would be thwarted should New Mexico law apply to the HUB Agreements.[153]

The policies underlying Texas contract law include upholding party expectations and ensuring parties get the benefit of their bargains.[154]  Based upon the nature of the events that occurred in Texas, certainty, predictability, and uniformity of result militate in favor of the application of Texas law.[155]  Neither Texas law nor New Mexico law presents an overly burdensome set of rules for the Court to apply.[156]  Based upon this analysis, Texas law should apply to construe the HUB Agreements.

---

[148] *See id.* § 188(2)(d).

[149] *See id.* § 188(2)(e).

[150] *See id.* § 6(a).

[151] *See id.* § 6(b).

[152] *See id.* § 6(c).

[153] *See id.* § 6(d).

[154] *See id.* § 6(e).

[155] *See id.* § 6(f).

[156] *See id.* § 6(g).

2. <u>Choice of Law for the Talbot Agreement</u>

The Talbot Agreement contains a choice of law provision, which states:

> Governing Law. This Agreement shall be governed by and construed in accordance with the substance laws of the State of New Mexico without giving effect to the principles of conflict of law thereof.[157]

According to Texas choice of law principles, this provision will be given effect to construe the Talbot Agreement, unless Section 187 of the Restatement determines otherwise.[158] New Mexico has a substantial relationship with Defendant, who is a domiciliary of New Mexico.[159] New Mexico has a relationship to Plaintiff, as well, insofar as some of the clients Plaintiff serviced as Defendant's employee are in New Mexico.[160]

On the other hand, an application of New Mexico law would run contrary to Texas's fundamental policy regarding restrictive covenants. According to the Texas Supreme Court, "the law governing enforcement of non[-]competition agreements is fundamental policy in Texas."[161] Similarly, the law governing enforcement of non-solicitation agreements is fundamental policy in Texas, because such agreements are governed by the same principles of law as non-compete agreements.[162] Application of the Restatement Second section 188 militates in favor of applying Texas law to the HUB Agreements. Because the Texas Supreme Court has expressed a preference for applying its own law to determine the validity and enforcement of restrictive covenants, the Talbot Agreement will be construed pursuant to Texas law.

---

[157] Pl.'s Mot. Summ. J., Ex. 1 Talbot Agreement ("Talbot Agreement") ¶ 8.

[158] *See DeSantis*, 793 S.W.2d at 677.

[159] Restatement (2d) of Conflicts of Law § 187(2)(a).

[160] *Id.*

[161] *DeSantis*, 793 S.W.2d at 681.

[162] *See Miller Paper Co.*, 901 S.W.2d at 600.

## C.     Texas Contract Law

Respecting the formation of contracts, "[a] court of law normally will not inquire into the adequacy of consideration supporting a contract."[163]  If a party challenges the adequacy of consideration, "[the Court] will not look beyond the face of the contract unless there is unconscionability, bad faith, or fraud, in which case [the Court] may consider the adequacy of consideration in the interest of equity."[164]  Consideration will be deemed inadequate only if it is "so grossly inadequate as to shock the conscience, being tantamount to fraud."[165]

Pursuant to Texas law, "[i]n construing a contract, [the Court] must ascertain and give effect to the parties' intentions as expressed in the document."[166]  The Court will "consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement."[167]  "If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and [the Court will] construe it as a matter of law."[168]  If there is any ambiguity in the contract, Texas courts will enforce the contract as written.[169]  A Texas court will "ascertain and give effect to the parties' intentions as expressed in the document."[170]  Accordingly, "[a] contract is not ambiguous if it can be given a certain or definite legal

---

[163] *Parker v. Dodge*, 98 S.W.3d 297, 302 (Tex. App. 2003) (citing *Neeley v. Intercity Mgmt. Corp.*, 623 S.W.2d 942, 953 (Tex. App. 1981)).

[164] *City of Lubbock v. Phillips Petroleum Co.*, 41 S.W.3d 149, 161 (Tex. App. 2000) (citing *Martin v. Martin, Martin & Richards, Inc.,* 12 S.W.3d 120, 125 (Tex. App. 1999) (no writ)).

[165] *Id.* (citing *Cearley v. Cearley,* 331 S.W.2d 510, 512 (Tex. Civ. App. 1960) (no writ)).

[166] *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005) (citations omitted).

[167] *Id.* at 312 (citation omitted).

[168] *Id.* (citation omitted).

[169] *Lopez v. Munoz, Hockema & Reed*, 22 S.W.3d 857, 862 (Tex. 2000) (citation omitted).

[170] *Id.* at 861 (citation omitted).

meaning or interpretation."[171]  "Ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable."[172]

1.    Modification or Novation of a Contract

Pursuant to Texas law, "[p]arties may modify a contract just as they originally make a contract."[173]  "A novation occurs if a contract evidences an intention to relinquish and extinguish pre-existing claims and rights of action."[174]  When parties execute a modification to a contract or an entirely new contract, "[t]he rules of contractual construction dictate that '[a] contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract.'"[175]  This presumption is conclusive.[176]

The burden of proof for establishing a novation rests on the party asserting the substitution.[177]  Pursuant to Texas law, "[t]he essential elements of a novation are: (1) a previous, valid obligation; (2) a mutual agreement of the parties to the acceptance of a new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract."[178]  The "[C]ourt may infer that a new agreement is a novation of an earlier agreement when the new agreement is so inconsistent with the earlier agreement

---

[171] *Id.* (citations omitted).

[172] *Id.* (citations omitted).

[173] *Mid Plains Reeves, Inc. v. Farmland Indus., Inc.*, 768 S.W.2d 318, 321 (Tex. App. 1989) (citations omitted).

[174] *CTTI Priesmeyer, Inc. v. K & O Ltd. P'ship*, 164 S.W.3d 675, 681 (Tex. App. 2005).

[175] *Montgomery Elevator Co. v. Tarrant County*, 604 S.W.2d 363, 367 (Tex. Civ. App. 1980) (citation omitted).

[176] *Id.*

[177] *CTTI Priesmeyer, Inc.*, 164 S.W.3d at 680-81 (citation omitted).

[178] *Vickery v. Vickery*, 999 S.W.2d 342, 356 (Tex. 1999).

that the two agreements cannot subsist together."[179]  Accordingly, "the new contract must extinguish or excuse the duty to perform the existing obligation."[180]  The parties must intend to release each other from the obligations under the prior contract and to assume new obligations under the new contract.[181]

According to the Texas Supreme Court,

[i]n the absence of such inconsistent provisions of two contracts that both cannot stand, thereby working an implied novation, it is held that a second contract will operate as a novation of a first contract only when the parties to both contracts intend and agree that the obligations of the second shall be substituted for and operate as a discharge of the obligations of the first.[182]

The Texas Supreme Court determined "[i]t is not necessary . . . that a novation be in writing or that it be evidenced by express words; like any other ultimate fact it may be proved as an inference from the acts and conduct of the parties and other facts and circumstances."[183]  Under Texas law, "[a] new agreement can establish novation as a matter of law when the state of the evidence is such that reasonable minds cannot differ as to its effect."[184]  Whether a subsequent agreement is a novation of an earlier one is a question of intent.[185]  "The intent must be clear; novation is never presumed."[186]

## 2. Restrictive Covenants

### a. *Non-Disclosure Agreements*

Non-disclosure agreements vary from non-compete and non-solicitation covenants.[187]  Non-

---

[179] *CTTI Priesmeyer, Inc.*, 164 S.W.3d at 681 (citations omitted).

[180] *Honeycutt v. Billingsley*, 992 S.W.2d 570, 577 (Tex. App. 1999) (citation omitted) *reh'g overruled*, (May 20, 1999).

[181] *Id.*

[182] *Chastain v. Cooper & Reed*, 257 S.W.2d 422, 424 (Tex. 1953) (citations omitted).

[183] *Id.* (citations omitted).

[184] *CTTI Priesmeyer, Inc.*, 164 S.W.3d at 681 (citation omitted).

[185] *Fulcrum Cent. v. AutoTester, Inc.*, 102 S.W.3d 274, 277 (Tex. App. 2003) (citation omitted).

[186] *CTTI Priesmeyer, Inc.*, 164 S.W.3d at 681 (citation omitted).

[187] *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex. App. 1992).

disclosure agreements will be enforced even if a non-compete or non-solicitation covenant is otherwise invalid or unenforceable.[188]  Non-disclosure agreements remain enforceable because they are not considered restraints on trade.[189]  Such agreements "do not necessarily restrict a former employee's ability to compete with the former employer," nor do they "prohibit the former employee from using, *in competition with the former employer*, the *general* knowledge, skill, and experience acquired in former employment."[190]  Non-disclosure agreements "prevent[] only the disclosure of trade secrets and confidential information acquired by the former employee."[191]

### b.      *Non-Solicitation Agreements*

According to one Texas court, "[t]he purpose and effect of a [non-solicitation agreement] parallel those inherent in a non-compete covenant."[192]  Because non-compete covenants are considered to be analogous to non-solicitation agreements, a Texas court will apply the appropriate analysis for non-compete agreements to non-solicitation agreements.[193]

### c.      *Covenants Not to Compete*

Texas law provides

a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.[194]

---

[188] *See id.*

[189] *Id.* (citations omitted).

[190] *Id.* (citations omitted) (emphasis in original).

[191] *Id.* (citation omitted).

[192] *Miller Paper Co.*, 901 S.W.2d at 599.

[193] *See id.* at 600 (citation omitted).

[194] TEX. BUS. & COM. CODE ANN. § 15.50 (Vernon 2008).

Whether a covenant not to compete is reasonable or otherwise enforceable is a question of law for the Court.[195]

> i.    <u>Ancillary to or Part of an Otherwise Enforceable Agreement</u>

In order for the covenant not to compete to be "ancillary to or part of an otherwise enforceable agreement,"

> two conditions must be met: "(1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and (2) the covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement."[196]

Accordingly, "the agreement must give rise to an 'interest worthy of protection' by a covenant not to compete, and [] 'business goodwill and confidential or proprietary information are examples of such worthy interests.'"[197]  An employer's promise to provide confidential information to an employee and the employee's reciprocal promise not to disclose the confidential information "would meet the requirement that the covenant be designed to enforce the employee's consideration provided in the agreement."[198] However, if the employment relationship is one of "at-will employment," the employer's promise to provide confidential information is illusory, and therefore cannot give rise to a covenant not to compete because the employer could terminate the relationship prior to the provision of any information.[199]

Nonetheless, "a covenant not to compete is not unenforceable under the Covenants Not to Compete Act solely because the employer's promise is executory when made."[200]  Rather, "[i]f the agreement becomes enforceable after the agreement is made because the employer performs his promise

---

[195] *See Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644 (Tex. 1994) (citing *Martin v. Credit Prot. Ass'n*, 793 S.W.2d 667, 668-69 (Tex. 1990)).

[196] *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 648-49 (Tex. 2006) (citation omitted).

[197] *Id.* at 649 (citation omitted).

[198] *Id.*

[199] *Id.* at 648.

[200] *Id.* at 655.

under the agreement and a unilateral contract is formed, the covenant is enforceable if all other requirements under the Act are met."[201]  The Texas Supreme Court clarified "'[i]f only one promise is illusory, a unilateral contract can still be formed; the non-illusory promise can serve as an offer, which the promisor who made the illusory promise can accept by performance.'"[202]  In the context of an at-will employment agreement, "an at-will employee's non-compete covenant becomes enforceable when the employer performs the promises it made in exchange for the covenant."[203]

A Texas court will find consideration to be lacking when the consideration recited by an employer is neither a promise to provide confidential information nor training, but rather some other consideration, separate and apart from the purpose of the non-compete agreement, if the employer never provides confidential information or training.[204]  Where there is no agreement between employer and employee, whereby the employer promises to disclose confidential information or to provide the employee with access to confidential information, the employer "g[i]ve[s] no consideration to [the employee] because [the employer] d[oes] not promise to disclose confidential information or to allow [the employee] to gain *access* to information."[205]  Similarly, where an employee agrees not to disclose confidential information obtained from his employer while employed by his employer, if the agreement does not state the employer will disclose confidential information or provide access to such information, the covenant is not designed to enforce the employee's promise not to solicit.[206]

Under to Texas law, the Court may imply a promise to provide confidential information in a

---

[201] *Id.*

[202] *Id.* at 650 (citation omitted).

[203] *Id.* at 646.

[204] *Powerhouse Prods., Inc. v. Scott*, 260 S.W.3d 693, 698 (Tex. App. 2008).

[205] *Hardy v. Mann Frankfort Stein & Lipp Advisors, Inc.*, 263 S.W.3d 232, 245 (Tex. App. 2007) (emphasis added).

[206] *Id.*

non-compete agreement.[207]  However, the *Hardy* court refused to acknowledge an implied promise in the agreement at hand.  In *Hardy*, a defendant employer argued it made an implied promise to disclose information to its employee in its non-compete agreement.[208]  The agreement stated: "Employee shall not disclose or use at any time, except as part of his employment hereunder, either during or subsequent to his employment, any secret or confidential information or knowledge obtained by employee while employed by Employer either from Employer, its other employees, or its clients."[209]  The *Hardy* court drew the following distinction:

> [the employee] did not acknowledge that he had received or would receive confidential information.  Nor did the agreement contain representations that [the employee] was receiving consideration for agreeing to the non-disclosure and client-purchase provisions.  Thus, [the employee]'s employment agreement did not contain an implied promise by the employer that obligated [the employer] to disclose confidential information to [the employee].[210]

Therefore, the *Hardy* court concluded

> [the employee]'s agreement fails to establish that it is ancillary to or part of an otherwise enforceable agreement because [the employer] did not produce any evidence to establish that "the consideration given by the employer in the otherwise enforceable agreement [gave] rise to the employer's interest in restraining the employee from competing."[211]

Therefore, "because there [wa]s no consideration, the agreement between [the employer] and [the employee] [wa]s unenforceable."[212]

ii.    Reasonable as to Time, Geographical Area, and Scope of Activity

If a covenant not to compete is ancillary to or part of an otherwise enforceable agreement, the

---

[207] *See, e.g.*, *CRC-Evans Pipeline Int'l v. Myers*, 927 S.W.2d 259, 265 (Tex. App. 1996) (recognizing implied promise to provide training).

[208] *Hardy*, 263 S.W.3d at 246.

[209] *Id.* at 245-46.

[210] *Id.* at 247.

[211] *Id.* (citations omitted) (internal quotation marks omitted).

[212] *Id.*

covenant may still be invalidated because it is an impermissible restraint of trade and violative of public policy, "unless it meets a reasonableness standard."[213]  The reasonableness of a non-compete covenant is a question of law for the court.[214]  "Restraints are unreasonable if they are broader than necessary to protect the legitimate interests of the employer."[215]  An industry-wide exclusion of competition is unreasonable.[216]  Likewise, the Texas Supreme Court held a non-compete covenant is unreasonable if it is unlimited as to time.[217]  "In the case of covenants applied to a personal services occupation, such as that of a salesman, a restraint on client solicitation is overbroad and unreasonable when it extends to clients with whom the employee had no dealings during his employment."[218]  An employer asserting the validity of a restrictive covenant bears the burden of proving "the limitations were necessary to protect the goodwill or business interests of the company."[219]

Pursuant to Texas law, if the Court finds a restrictive covenant, which is ancillary to or part of an otherwise enforceable agreement, to be unreasonable, the Court will reform the covenant to make it reasonable, and therefore, enforceable.[220]  If the party requesting reformation cannot demonstrate the reformation of the covenant is "reasonable and necessary to protect the goodwill or other business interest of the company," the covenant cannot be reformed.[221]

---

[213] *John R. Ray & Sons v. Stroman*, 923 S.W.2d 80, 84 (Tex. App. 1996) (citing *Juliette Fowler Homes v. Welch Assoc.*, 793 S.W.2d 660, 662 (Tex. 1990)).

[214] *Id.* (citing *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991)).

[215] *Id.* (citing *DeSantis*, 793 S.W.2d at 681-82).

[216] *Id.* (citing *Haass*, 818 S.W.2d at 386-88).

[217] *Id.* (citing *Juliette Fowler Homes*, 793 S.W.2d at 662-63).

[218] *John R. Ray & Sons, Inc.*, 923 S.W.2d at 85 (citations omitted).

[219] *Id.* (citation omitted).

[220] TEX. BUS. & COM. CODE ANN. § 15.51(c).

[221] *John R. Ray & Sons, Inc.*, 923 S.W.2d at 85-86 (citations omitted).

3.     Estoppel or Quasi-Estoppel

According to the Texas Supreme Court, "[t]he purpose of estoppels is to prevent inconsistency and fraud resulting in injustice."[222]

> Estoppel is a doctrine for the prevention of injustice.  It is for the protection of those who have been misled by that which upon its face was fair, and whose character as represented parties to the deception will not, in the interest of justice, be heard to deny.  But one entitled to its protection must have been misled.[223]

"Estoppels are equitable in nature. They were created by a court of equity in order to promote justice and to prevent a party from benefit[t]ing by his own misleading representations."[224]  According to one Texas court,

> [e]quitable [e]stoppel is the effect of the voluntary conduct of a person whereby he is precluded from asserting rights against another relying on such conduct; and it arises where a person by his acts, representations, or even silence, induces another to believe that certain facts exist, or is led to change his position for the worse.[225]

"[E]ach case in which equitable estoppel is sought to be applied must rest upon its own facts."[226]

Quasi-estoppel will preclude a party from asserting a right inconsistent with a position previously taken to another party's detriment.[227]  Quasi-estoppel "applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit."[228]  Quasi-estoppel "requires (1) a previous action and (2) a subsequent inconsistent action which is thereby sought to be estopped."[229]  "[F]ailure to prove any one or

---

[222] *Kuehne v. Denson*, 219 S.W.2d 1006, 1009 (Tex. 1949) (citation omitted) (internal quotation marks omitted).

[223] *Id.* (citation omitted).

[224] *Richey v. Miller*, 177 S.W.2d 255, 256 (Tex. 1944).

[225] *Theriot v. Smith*, 263 S.W.2d 181, 183 (Tex. Civ. App. 1953) (citations omitted).

[226] *Barfield v. Howard M. Smith Co. of Amarillo*, 426 S.W.2d 834, 838 (Tex. 1968).

[227] *Lopez*, 22 S.W.3d at 864 (citation omitted).

[228] *Id.* (citation omitted).

[229] *Mulvey v. Mobil Producing Tex. & N.M., Inc.*, 147 S.W.3d 594, 607 (Tex. App. 2004) (citation omitted).

more of the elements is fatal."[230]  In order to establish a defense of quasi-estoppel, the party claiming the defense must show he "was without knowledge, or the means of acquiring knowledge, of the facts which the party to be estopped is alleged to have represented by his acts, conduct or silence."[231]  "[W]here the real facts were known to a person or were open for his convenient ascertainment, he was not justified in relying on representation pertaining thereto and he cannot effectively say that he was misled or deceived by such representations."[232]

Where a party waives reliance on a previous contract, under equitable principles it will be estopped.[233]  "[A]cceptance of the benefits[] is a species of quasi-estoppel."[234]  According to Texas courts, "[e]stoppel is an equitable defense," and therefore, "[i]t is not for the jury to determine the expediency, necessity, or propriety of equitable relief."[235]  "The decision to grant or deny equitable relief is for the trial court."[236]

## IV.    DISCUSSION

### A.    Whether Defendant is Talbot

Defendant contends it is Talbot because it merely changed "Talbot" to "Hub International Southwest Agency Limited."  Defendant relies upon Defendant's Regional Vice President's affidavit, Hub International's Form 10-k Annual Report ("Report"), Plaintiff's W-2s, and information on the IRS's website.  Plaintiff attests he is unaware of the mechanics of how his employer changed from Talbot to

---

[230] *Barfield*, 426 S.W.2d at 838 (citations omitted).

[231] *Id.* (citations omitted).

[232] *Id.* (citations omitted) (internal quotation marks omitted) (alteration in original).

[233] *Montgomery Elevator Co.*, 604 S.W.2d at 367.

[234] *Lopez*, 22 S.W.3d at 864 (citation omitted).

[235] *Cimarron Country Property Owners Ass'n v. Keen*, 117 S.W.3d 509, 512 (Tex. App. 2003) (citation omitted).

[236] *Id.* (citation omitted).

Defendant.[237] Nonetheless, he offers print-outs from various areas of Hub International's website to prove the change from "Talbot" to "Hub International Southwest Agency Limited" was more than a name-change.

Defendant's Regional Vice President, Timothy Collins ("Collins"), declares in July 2004, Hub International purchased Talbot Financial from Safeco.[238] He states after Hub International acquired Talbot Financial, Talbot continued to do business under Defendant's name.[239] Defendant also presents Hub International's Report, filed on March 13, 2006, for the period ending December 31, 2005.[240] Defendant avers the Report is self-authenticating pursuant to Federal Rule of Evidence 902 ("Rule 902"). Plaintiff does not contest the admissibility of this official record.

The Report states HUB International's subsidiaries as of March 8, 2006, consisted of "Hub International Southwest Agency Limited (f/k/a Talbot Agency, Inc.)," incorporated under the laws of New Mexico.[241] Martin P. Hughes, Chairman and Executive Officer of Hub International, certified he reviewed the report and "[b]ased upon [his] knowledge, the financial statements, and other financial information included in [the] report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in the report."[242] Hub International's Vice President and Chief Financial Officer similarly certified the report.[243]

In addition to Collins' testimony and the Report, Defendant offers Plaintiff's redacted W-2s from

---

[237] Pl.'s Resp., Ex. A., Aff. of Pl. ("Pl.'s 2d Aff.") ¶ 4.

[238] Def.'s Cross-Mot. Summ. J., Ex. 1, Aff. of Collins ("Collins' 1st Aff.") ¶ 6.

[239] *Id*. ¶ 7.

[240] Def.'s Cross-Mot. Summ. J., Ex. 2, Report at 1.

[241] *Id*. at 3.

[242] *Id*. at 6.

[243] *Id*. at 7.

federal tax years 2004 through 2007.[244]  Collins authenticated the W-2s,[245] and Plaintiff does not contest

their authenticity.  Plaintiff's W-2 from 2004 lists Talbot as Plaintiff's employer and lists Talbot's EIN as

85-0152979.[246]  Plaintiff's W-2 from 2005 also lists Plaintiff's employer as Talbot and lists Talbot's EIN

as 85-0152979.[247]  Plaintiff's W-2 from 2006, on the other hand, lists Plaintiff's employer as "Hub

International Southwest Agency."[248]  The EIN remains 85-0152979, the same as Talbot's.[249]  Plaintiff's

W-2 from 2007 also has Defendant's name as "Hub International Southwest Agency" with the same

EIN.[250]

Defendant offers a print-out from the IRS's website regarding EINs.[251]  Plaintiff has not

contested the admissibility of the print-out.  Based upon case law, which holds records on government

websites are self-authenticating pursuant to Rule 902(5), a matter of public record, and therefore not

hearsay, the print-out is admissible.[252]  According to the IRS print-out, a corporation is required to obtain

a new EIN if the corporation receives a new charter from the secretary of state; the corporation is a

subsidiary of a corporation using its parent's EIN or the corporation becomes a member of a subsidiary

of a corporation; the corporation changes to a partnership or sole proprietorship; or a new corporation is

created after a statutory merger.[253]  The print-out states a corporation does not need to obtain a new EIN

---

[244] Def.'s Cross-Mot. Summ. J., Ex. A, Pl.'s W-2s ("Pl.'s W-2s").

[245] Collins' 1st Aff. ¶ 7.

[246] Pl.'s W-2s at 1.

[247] *Id.* at 2.

[248] *Id.* at 3.

[249] *Id.*

[250] *Id.* at 4.

[251] Def.'s Cross-Mot. Summ. J. Ex. 3. IRS Print-out ("IRS Print-out").

[252] *Paralyzed Veterans of Amer. v. McPherson*, 2008 WL 4183981, at *7 (N.D. Cal. 2008) (collecting cases)

[253] IRS Print-out at 1.

if it is a division of a corporation; the surviving corporation uses the existing EIN after a corporate merger; a corporation declares bankruptcy; a corporate name or location changes; a corporation chooses to be taxed as an S corporation; or reorganization of a corporation changes only the identity or place of the corporation.[254]

The Internal Revenue Code ("IRC") states "[a]ny *person* required under the authority of [the IRC] to make a return, statement, or other document shall include in such return, statement, or other document such identifying number as may be prescribed for securing proper identification of such *person*."[255]  The IRC defines a "person" as an "individual, a trust, estate, partnership, association, company[,] or *corporation*."[256]  According to the Code of Federal Regulations, an "[EIN]"

> means the taxpayer identifying number of an individual or other person (whether or not an employer) which is assigned pursuant to section 6011(b) or corresponding provisions of prior law, or pursuant to section 6109, and in which nine digits are separated by a hyphen, as follows: 00-0000000.  The terms "employer identification number" and "identification number" (defined in § 31.0-2(a)(11) of this chapter (Employment Tax Regulations)) refer to the same number.[257]

Pursuant to section 6109, "[EINs] are used to identify employers."[258]  Accordingly, "taxpayer identifying numbers must be used as follows: . . . [a]ny person other than an individual (such as corporations, partnerships, nonprofit associations, trusts, estates, and similar nonindividual persons) that is required to furnish a taxpayer identifying number must use an [EIN]."[259]

The Code of Federal Regulations also states that

> [a]ny person required to furnish an [EIN] must apply for one, if not done so previously . . . . The person must make such application far enough in advance of the first required use

---

[254] *Id.*

[255] 26 U.S.C. § 6109(a)(1) (emphasis added).

[256] *Id.* § 7701(a)(1) (emphasis added).

[257] 26 C.F.R. § 301.7701-12.

[258] *Id.* § 301.6109-1(a)(1)(ii).

[259] *Id.* § 301.6109-1(a)(1)(ii)(C).

of the employer identification number to permit issuance of the number in time for compliance with such requirement.[260]

"Any entity that has an [EIN] will retain that EIN if its federal tax classification changes under § 301.7701-3."[261]   Section 7701-3 does not apply to corporations.[262]

The United States Supreme Court has noted

the general rule of corporate liability is that, when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability.[263]

A corporation that undergoes a name change is still a contracting party.[264]   Texas law[265] and Illinois law[266] hold the same.

Plaintiff has offered no evidence which shows there is a genuine issue of material fact about Talbot's name-change to "Hub International Southwest Agency Limited."   Plaintiff states he is unaware of the dynamics of the changeover from "Talbot" to "Hub International Southwest Agency Limited."[267] Plaintiff's attorney avers the copies of website print-outs[268] Plaintiff offers in support of his argument that the changeover was more than a name-change are true and correct copies, which he accessed and printed on December 4, 2008.   Defendant argues the print-outs are not admissible because they lack

---

[260] *Id.* § 301.6109-1(d)(2)(i).

[261] *Id.* § 301.6109-1(h)(1).

[262] *See id.* § 301.7701-3.

[263] *Golden State Bottling Co., Inc. v. N.L.R.B.*, 414 U.S. 168, 182 n.5, 94 S.Ct. 414, 424 n.5 (1973) (citations omitted).

[264] *See John Hancock Mut. Life Ins. Co. v. Harris Trust & Savings Bank*, 510 U.S. 86, 89-90 n.1, 114 S. Ct. 517, 126 L. Ed. 524 (1993).

[265] *See In re H&R Block Fin. Advisors, Inc.*, 235 S.W.3d 177, 178 (Tex. 2007) (citations omitted).

[266] *See Terminal Freezers, Inc. v. Roberts Frozen Foods, Inc.*, 354 N.E.2d 904 (Ill. App. 1976).

[267] Pl.'s 2d Aff. ¶ 4.

[268] Pl.'s Resp., Ex. B, Hub Int'l Print-outs ("Hub Int'l Print-outs").

authenticity, a foundation, and are hearsay.

Defendant is right, to an extent. The print-outs have been authenticated by Plaintiff's attorney. However, the print-outs are inadmissible hearsay, for which Plaintiff has not laid a foundation to demonstrate an exception or exclusion applies. Hub International is not Plaintiff's employer, and therefore no exclusion pursuant to Federal Rule of Evidence 801(d)(2)(D) is available. To the extent that some of the print-outs include press releases, which may be admissible under the Federal Rules of Evidence's residual hearsay exception, they do not create a genuine dispute of material fact.

As Defendant points out, the press releases do not contradict Defendant's evidence. One press release announces Hub International was going to invest in Satellite, "a corporation formed by a senior management group of Talbot Financial," and to use the proceeds to purchase Talbot Financial and its subsidiaries from Safeco.[269] According to the press release, under the purchase agreement, Hub International would acquire 70% of Satellite, and management of Talbot Financial would hold the remaining 30% of Satellite.[270] Hub International would purchase the remaining 30% interest over the next three years.[271] Another press release from July 1, 2004, states Hub International announced its acquisition of Talbot Financial.[272] According to the press release, "[t]he acquisition from Safeco [] was implemented via Hub International's purchase of a 70% interest in Satellite [], a corporation formed by Randy Talbot and senior management at Talbot."[273] The press release notes the proceeds of the investment were used to purchase Talbot and all of its subsidiaries from Safeco for $90 million.[274] A third press release from July 27, 2004, mentions Hub International's acquisition of Talbot earlier in July

---

[269] *Id.* at 16.

[270] *Id.*

[271] *Id.*

[272] *Id.* at 18.

[273] *Id.*

[274] *Id.*

2004.[275]  This information does not controvert any of the evidence Defendant has presented and therefore creates no genuine dispute of material fact.  Accordingly, the evidence shows Talbot became Defendant pursuant to a name-change, and Defendant remained a party to Talbot's contracts.[276]

  B. *The Validity of the HUB Agreements*

    1. <u>Whether a Novation Occurred</u>

  Plaintiff contends the HUB Agreements control the outcome of this case because the annual HUB Agreements controlled his employment.  Plaintiff notes the non-solicitation provision in these agreements militate for summary judgment in his favor.  Because Plaintiff did not voluntarily terminate his employment, Plaintiff argues he is not subject to any solicitation bar pursuant to the HUB Agreements.  Defendant contends that because it is Talbot, its HUB Agreements incorporate the Talbot Agreement, and therefore Plaintiff is subject to a non-solicitation covenant regardless of how his employment was terminated.

  The terms of the HUB Agreements vary substantially from the terms of Plaintiff's employment when Defendant was called "Talbot."  Whether the modification of the terms of Plaintiff's employment effected a novation, thereby invalidating the Talbot Agreement, is a question of intent.[277]  When Plaintiff went to work for Talbot in 2002, he was paid a straight 35% of the commissions he generated on both new and old policies.[278]  Talbot matched Plaintiff on a dollar for dollar basis, up to 6% of his salary, as part of the 401(k) program.[279]  Defendant does not contest or offer any evidence to the contrary regarding the terms of Plaintiff's employment from 2002 to 2004.  Plaintiff states the terms of his compensation

---

[275] *Id.* at 20.

[276] *See In re H&R Block Fin. Advisors, Inc.*, 235 S.W.3d at 178 (citations omitted).

[277] *See Fulcrum Cent.*, 102 S.W.3d at 277 (citation omitted).

[278] Pl.'s Mot. Summ. J., Ex. A, Pl.'s Aff. ("Pl.'s 1st Aff.") ¶ 5.

[279] *Id.* ¶ 5.

changed when he began to work for Defendant in 2004.[280]

Plaintiff avers that when Defendant acquired Talbot, Plaintiff was required to execute annual employment agreements with Defendant, and these HUB Agreements changed the terms of his employment.[281] Plaintiff was paid 38% commissions for new policies, but was paid only 28% commissions for renewed policies.[282] This resulted in an overall reduction of the total commissions paid to him.[283] Plaintiff states the amount of Defendant's 401(k) contributions was reduced to 60% of Plaintiff's contribution, up to 6% of Plaintiff's salary.[284] Defendant no longer paid him any commissions for policies that generated less than $500 in annual revenue.[285]

Plaintiff offers his HUB Agreement from 2008 to demonstrate how the terms of his employment changed.[286] The 2008 HUB Agreement supports Plaintiff's testimony regarding his compensation package as Defendant's employee. It designates producers either Level 1 or Level 2, based upon the amount of annual revenue they bring in. The 2008 HUB Agreement states new accounts and renewals generating less than $500 may be assigned to the small business unit, and the agent responsible for the account will not be paid any commissions for them.[287] For new accounts, a producer earned an additional 10%, depending upon their level designation.[288]

---

[280] Pl.'s 2d Aff. ¶ 4.

[281] Pl.'s 1st Aff. ¶ 6; Pl.'s 2d Aff. ¶ 4.

[282] Pl.'s 1st Aff. ¶ 6.

[283] *Id.*

[284] *Id.*

[285] *Id.*

[286] Pl.'s Mot. Summ. J., Ex. 2, Hub International Southwest 2008 Producers Incentive Compensation Plan ("2008 HUB Agreement") at 2. Those producers who generated $500,000 or more in revenue the previous year were designated Level 2 producers and earned 30% commissions for renewals. Those producers who generated less than $500,000 were designated Level 1 producers and earned 28% commissions for renewals. *Id.*

[287] *Id.*

[288] *Id.*

The 2008 HUB Agreement sets up an at-will employment relationship with Plaintiff.[289]  The

2008 HUB Agreement states

> [a]s a condition to participating in the plan, the participant acknowledges [Defendant]'s
> reservation of rights to change, modify or terminate the plan without notice and has no
> further obligation to participant.  Furthermore, the participant maintains no present
> interest in or entitlement to plan benefits other than those determined by Hub to be
> payable under the terms of the plan for which payment is or will be paid.[290]

The 2008 HUB Agreement also specifically provides for an at-will relationship.[291]

Pursuant to Texas law, the HUB Agreements are the controlling documents for Plaintiff's and

Defendant's employment relationship.  While Plaintiff does not offer any agreement containing the

compensation terms of his employment beginning in 2002 with Talbot, Defendant does not contest those

were the terms of his compensation.  These agreements completely rewrite the terms of Plaintiff's

employment with Defendant.  The HUB Agreements change the rate of commissions he was paid.

Furthermore, he was required to execute these agreements annually.

None of the parties' evidence presents a dispute regarding the material change in Plaintiff's

employment terms.  Plaintiff's testimony demonstrates he and Talbot operated pursuant to terms of a

previous, valid obligation, and Defendant does not dispute this with any evidence.[292]  Plaintiff and

Defendant mutually agreed to and executed annual employment agreements.[293]  When Defendant paid

Plaintiff at the rates set forth in the annual HUB Agreements, the terms of employment by which Plaintiff

worked from 2002 to 2004 were extinguished, and Plaintiff worked under the terms of the HUB

Agreements.[294]

---

[289] *Id.* at 10.

[290] *Id.*

[291] *Id.* at 12-13.

[292] *See Mid Plains Reeves, Inc.*, 768 S.W.2d at 321.

[293] *See id.*

[294] *See id.*

Based upon the evidence presented by Plaintiff and Defendant, there is no genuine dispute of material fact that the HUB Agreements controlled the terms of Plaintiff's compensation and at-will employment with Defendant. Ultimately, the parties' intent controls whether the HUB Agreements replaced Plaintiff's previous employment terms with Talbot.[295] It is clear Plaintiff and Defendant intended the HUB Agreements to be the operative agreements.[296] The obvious discrepancies in Plaintiff's terms of employment from 2002 and 2008 "evidences an intention to relinquish and extinguish pre-existing claims and rights of action."[297] Therefore, reasonable minds could not differ as to the 2008 HUB Agreement being the relevant employment agreement governing this dispute.[298]

### 2. Whether the Non-Solicitation Agreement is Enforceable

Even if the 2008 HUB Agreement is operative, however, the solicitation bar of Section VII of the agreement may not be enforceable. Both Plaintiff and Defendant assume the validity of the non-solicitation provision of the HUB Agreement. Plaintiff argues the "voluntary termination" aspect of it applies, such that Plaintiff is not bound by the solicitation bar. On the other hand, Defendant contends Section VII incorporates the Talbot Agreement, which bars Plaintiff from soliciting its customers for two years, regardless of whether Plaintiff was voluntarily or involuntarily terminated. Yet neither Plaintiff nor Defendant have established in argument that Section VII of the HUB Agreement is an enforceable covenant.

The non-solicitation provision can only be valid if it is ancillary to or part of an otherwise enforceable agreement. Section VII of the 2008 HUB Agreement states:

> In return for the benefits Employee receives under this Plan, Employee agrees that during the term of employment and for two years from Employee's voluntary termination of employment Employee will not: (1) directly or indirectly influence or advise any other

---

[295] *See Fulcrum Cent.*, 102 S.W.3d at 277.

[296] *See CTTI Priesmeyer, Inc.*, 164 S.W.3d at 681.

[297] *See id.*

[298] *See id.*

person to employ or solicit for employment anyone who is employed by [Defendant] on the date of Employee's separation; (2) directly or indirectly influence or advise any person who is or shall be in the service of [Defendant] to leave the service of [Defendant]; (3) use any of the information or business secrets used by [Defendant]; (4) disclose the proprietary methods of conducting business of [Defendant]; (5) make any statement or take any actions that may interfere with [Defendant]'s business relationship with [Defendant]'s customers; (6) attempt to divert any of the business of [Defendant] or any business which [Defendant] has a reasonable expectation of obtaining by soliciting, contacting, or communicating with any customers and/or potential customers which have been derived from leads or lists developed and delivered to Employee by [Defendant].

If Employee has executed another non-compete, non-solicitation or employment contract with [Defendant], the terms of that agreement are incorporated herein by reference and shall remain in full force and effect. If any of the terms of this Section conflict with Employee's other non-compete or non-solicitation agreement, the terms of Employee's other agreement shall control.[299]

The 2008 HUB Agreement also contains a non-disclosure provision, which states

[i]n consideration of being employed by [Defendant], Employee agrees that during and following employment with [Defendant], Employee will hold in strictest confidence and will not disclose to anyone any information concerning

1.  The business or affairs of a current, past or prospective customer of [Defendant].
2.  The development of any product, device or invention of [Defendant], including price strategy, marketing strategy, marketing and sales focus.
3.  Any list or information from the company in all forms including, hand written, digital, memorized or from memory, or any other form of customer information.
4.  Any information concerning [Defendant] or its operations not readily available to the public, unless expressly authorized by the President of [Defendant] or any legal entity which is defined as a part of [Defendant].

Employee further agrees that all rights, title and interest to any product, device, invention, or enhancement to a product or service, developed during employment with [Defendant] and using [Defendant] resources or know-how, shall belong exclusively to [Defendant]. Employee agrees to execute any documents necessary to reflect [Defendant]'s exclusive ownership in such items.

Upon termination of employment with [Defendant], Employee will deliver to [Defendant] all documents, notes, materials and all copies thereof, relating to the operations of the business of [Defendant] and its customers.[300]

In the first instance, the non-disclosure agreement is an otherwise enforceable agreement. The 2008

HUB Agreement states Plaintiff's employment serves as consideration for Plaintiff's promise to keep

---

[299] 2008 HUB Agreement at 12.

[300] *Id.*

confidential information concerning any of Defendant's past, current, or prospective customers. Pursuant to Texas law, any consideration exchanged for the promise not to disclose information gives rise to a valid non-disclosure agreement, and it is not the Court's place to look into the adequacy of consideration.[301] Here, Defendant employed Plaintiff in exchange for Plaintiff's promise not to disclose customer information. Therefore, there is a valid non-disclosure agreement.

Whether the Section VII non-solicitation provision of the 2008 HUB Agreement is ancillary to or part of the non-disclosure agreement depends upon if the consideration Defendant gave Plaintiff for the non-disclosure agreement gave rise to Defendant's interest in restraining Plaintiff from soliciting its customers, and if the non-solicitation agreement is designed to enforce Plaintiff's promise not to disclose confidential information.[302] Here, Defendant's consideration for Plaintiff's promise not to divulge confidential information was to employ Plaintiff. Providing Plaintiff with employment alone cannot justifiably be said to give rise to Defendant's interest in restraining Plaintiff from soliciting Defendant's customers, as this is not the type of interest the Texas Supreme Court has found the Texas legislature sought to protect.[303]

This does not end the inquiry, however. Defendant contends it has provided Plaintiff access to and actual confidential information. Plaintiff denies he accessed Defendant's information. Taking Plaintiff's contention as true does not negate Defendant's assertion it granted Plaintiff access to the Sagitta and Pipeline data systems. By providing access to Defendant's confidential information, a unilateral contract formed between Defendant and Plaintiff, with Plaintiff's recited consideration in the 2008 HUB Agreement not to disclose confidential information serving as the offer, and Defendant's provision of access serving as the acceptance.[304] Providing such access to Defendant's confidential

---

[301] See Parker, 98 S.W.3d at 302 (citation omitted).

[302] See Alex Sheshunoff Mgmt. Servs., L.P., 209 S.W.3d at 648-49 (citation omitted).

[303] See id. at 657; Powerhouse Prods., Inc., 260 S.W.3d at 697.

[304] Hardy, 263 S.W.3d at 245.

44

information gives rise to an interest Defendant seeks to protect by barring Plaintiff from soliciting Defendant's clients by using the accessible information. Therefore, the non-solicitation covenant of Section VII is ancillary to or part of an otherwise enforceable agreement. Plaintiff's argument the information was not confidential because he was servicing the clients prior to ever working for Defendant as "Talbot" or "Hub International Southwest Agency Limited" does not invalidate the non-solicitation provision because Defendant provided Plaintiff access to confidential information about clients other than the ones Plaintiff brought to Talbot.

Having considered whether Section VII is ancillary to or part of an otherwise enforceable agreement, the validity and enforceability of the non-solicitation covenant depends upon whether it is reasonable.[305] The provision does not contain a geographical limitation. However, the issue here does not go to Plaintiff's ability to compete with Defendant, but rather Plaintiff's ability to solicit Defendant's customers. The need for such a geographical limitation is non-existent because Defendant has affirmatively stated the solicitation bar goes only to the clients Plaintiff serviced while he was employed with Defendant.[306]

Defendant's non-solicitation restriction is reasonable to the extent it prohibits Plaintiff from soliciting the clients Plaintiff served as a result of having access to confidential information. Defendant's construction of its non-solicitation provision is reasonable because if Plaintiff was denied the opportunity to solicit Defendant's customers, which he never serviced, such a limitation would be an unduly restrictive restraint of trade and a violation of Texas public policy. Neither is the two-year bar on solicitation unreasonable, as Texas courts frequently uphold such limitations.[307]

Nonetheless, Defendant demands Plaintiff be barred from soliciting clients Plaintiff actually

---

[305] *See John R. Ray & Sons*, 923 S.W.2d at 84.

[306] Def.'s Cross-Mot. Summ. J. at 9 (stating "it is only applicable to the customers that Plaintiff served while at [Defendant]").

[307] *See, e.g.*, *Mosimann v. Employers Cas. Co.*, 354 S.W.2d 171, 172 (Tex. App. 1962) (holding two-year bar on solicitation was not unreasonable).

cultivated independent of the information to which he had access prior to working for "Talbot" or "Hub International Southwest Agency Limited." That is, Defendant would like to have clients Plaintiff cultivated before he joined Talbot be included in the prohibition. That is simply unreasonable and actually out of the scope or purview of the contract.

Talbot, later as "Hub International Southwest Agency Limited," enjoyed the fruits of Plaintiff's pre-existing book of business, clients Plaintiff had cultivated _prior_ to commencing his employment with Talbot. Talbot, later as Defendant, received substantial premiums from those clients. These rewards came not as a result of Plaintiff's access to the data systems made available to Plaintiff by Defendant, but rather as a result of Plaintiff's sweat equity, invested long before he became an employee of Talbot, later Defendant. Any restrictions on Plaintiff's ability to solicit Talbot's clients necessarily should be related to the information to which Plaintiff was granted access. To hold otherwise would permit Defendant to enforce a non-solicitation provision which is not related to protecting Defendant's goodwill or business interests.[308] Therefore, Defendant's non-solicitation restriction in Section VII is only enforceable to the extent it protects Defendant from having the clients Plaintiff cultivated _after_ he became employed by Talbot "poached" by Plaintiff.

Nonetheless, Plaintiff contends Section VII does not bar him from soliciting _any_ of Defendant's customers because his termination was involuntary. Plaintiff points to the specific phrase "voluntary termination of employment" to defend his argument. Accordingly, Plaintiff requests the Court to find the solicitation bar does not apply to Plaintiff.

In asking the Court to make such a finding, however, Plaintiff is asking the Court to read only the first paragraph of the provision. Section VII, by its express language, incorporates the Talbot Agreement. Specifically, Section VII provides

> If Employee has executed another non-compete, non-solicitation or employment contract with HUB, the terms of that agreement are incorporated herein by reference and shall

---

[308] _John R. Ray & Sons, Inc._, 923 S.W.2d at 85.

remain in full force and effect. If any of the terms of this Section conflict with Employee's other non-compete or non-solicitation agreement, the terms of Employee's other agreement shall control.[309]

Plaintiff has not presented a genuine dispute of material fact regarding Defendant's name-change from "Talbot" to "Hub International Southwest Agency Limited." Therefore, the language of Section VII incorporates the Talbot Agreement and states it remains in full force and effect. To the extent the Talbot Agreement applies regardless of whether Plaintiff voluntarily or involuntarily terminated his employment with Defendant, the terms of Section VII conflict with the Talbot Agreement and therefore the Talbot Agreement "shall control."[310] While the express language of Section VII incorporates the Talbot Agreement, whether the Talbot Agreement is enforceable must be determined.

### C. *Enforceability of the Talbot Agreement*

Despite the choice-of-law provision in the Talbot Agreement, based upon Texas choice-of-law principles, Texas law determines whether the Talbot Agreement is valid and enforceable.[311] The Talbot Agreement provides Plaintiff may not compete with Talbot while under its employ.[312] It further states Plaintiff may not

> make any use for his own benefit or for the benefit of a business or entity other than [Talbot], of any secret or confidential information, customer lists or any other data of or pertaining to [Talbot], its business and financial affairs or its services not generally known within [Talbot's] trade and which was acquired by him during his affiliation with [Talbot].[313]

Of particular relevance is paragraph 3, which states:

> Following the termination of the term of employment with [Talbot], regardless of the cause thereof, and continuing during the period which expires on the second anniversary

---

[309] 2008 HUB Agreement at 12.

[310] *Id.*

[311] *See supra* Part III.B.2.

[312] Pl.'s Mot. Summ. J., Ex. 1, Non-Solicitation Agreement by and between [Plaintiff] and [Talbot] ("Talbot Agreement") ¶ 1.

[313] *Id.* ¶ 2.

of such termination, Employee shall not (a) solicit, contact, interfere with, re-write or divert any customer served by [Talbot] during the period of the Employee's employment hereunder; or (b) solicit any person then or previously employed by [Talbot] to join Employee, whether as a partner, agent, employee, or otherwise, in any enterprise engaged in a business similar to the business of [Talbot] being conducted at the time of such termination.

With respect to (a) above, it is agreed by the parties that non-compliance resulting in loss of business to [Talbot] entitles [Talbot] to receive from Employee, and Employee agrees to promptly pay, two times the annual commission for any and all business that leaves [Talbot] as a direct or indirect result of non-compliance with (a) above.[314]

Paragraph 5 states

Employee acknowledges that the restrictions set forth in paragraphs 1, 2, and 3 are reasonable in scope and essential to the preservation of [Talbot's] business and proprietary properties and that the enforcement thereof will not in any manner preclude Employee, in the event of Employee's termination of employment with [Talbot], from becoming gainfully employed in such manner and to such extent as to provide a standard of living for himself, the members of his family, and those dependent upon him of at least the sort of fashion to which he and they have become accustomed and may expect.[315]

The Talbot Agreement states it "shall be binding upon and shall inure to the benefit of the transferees, successors and assigns of [Talbot], including any company or corporation with which [Talbot] may merge or consolidate."[316]

Plaintiff asserts Talbot never gave him any consideration in exchange for the Talbot Agreement. Defendant contends a unilateral contract arose when it provided Plaintiff access to Defendant's confidential and proprietary information. To the extent that Defendant provided access to the Sagitta and Pipeline data systems, such access served as the acceptance of Plaintiff's promise not to disclose confidential information.[317] This unilateral contract validated the non-disclosure agreement within the Talbot Agreement, thereby making the solicitation bar of the Talbot Agreement ancillary to or part of the

---

[314] *Id.* ¶ 3.

[315] *Id.* ¶ 5.

[316] *Id.* ¶ 10.

[317] *Hardy*, 263 S.W.3d at 245.

non-disclosure agreement.  Defendant's provision of such access gives rise to Defendant's interest in protecting such confidential information by barring Plaintiff from using the information to solicit Defendant's clients.  Therefore, the non-solicitation provision is ancillary to or part of an otherwise enforceable agreement.[318]

The non-solicitation provision must also be reasonable in order to be enforceable.[319]  Like Section VII of the 2008 HUB Agreement, the solicitation bar in the Talbot Agreement does not provide a geographic restriction.  This does not mean the provision is per se unreasonable.  Such a restriction is not necessary because Defendant has limited the solicitation bar to the clients Plaintiff serviced while working for Defendant.[320]  Neither is the two-year restriction unreasonable.[321]  Nonetheless, the Talbot Agreement's solicitation bar, like the 2008 HUB Agreement's non-solicitation provision, is only enforceable to the extent it protects Defendant from having the clients Plaintiff cultivated after he became employed by Talbot "poached" by Plaintiff.  To permit Defendant to enforce the full extent of the non-solicitation provision would be an unreasonable restraint on trade because it would allow Defendant to reap the benefit of client relationships arising wholly apart from the consideration Defendant gave to Plaintiff, that is access to data systems after Plaintiff had already developed the clients.  Therefore, the Court will reform the non-solicitation provision to make it reasonable as a matter of law.[322]  Barring Plaintiff from soliciting clients he acquired after he went to work for Talbot is a reasonable reformation.  Accordingly, Plaintiff will be permitted to solicit clients he had cultivated prior to working for Talbot, that is his "pre-existing" book of business.

---

[318] *See Alex Sheshunoff Mgmt. Servs., L.P.*, 209 S.W.3d at 648-49 (citation omitted).

[319] *See John R. Ray & Sons*, 923 S.W.2d at 84 (citation omitted).

[320] Def.'s Cross-Mot. Summ. J. at 9 (stating "it is only applicable to the customers that Plaintiff served while at [Defendant]").

[321] *See Mosimann*, 354 S.W.2d at 172.

[322] TEX. BUS. & COM. CODE ANN. § 15.51(c).

Stopping short of addressing Plaintiff's estoppel argument, the Court notes Defendant's piecemeal approach to contract construction beckons for the application of equitable estoppel or quasi-estoppel doctrines, as a matter of law. When Talbot became "Hub International Southwest Agency Limited," it induced its producers to enter the annual agreements, which control the employment relationship–one in which a producer now receives a lower rate of compensation–and include what will happen upon voluntary termination of the employment relationship, but then hearken back to a previous agreement, which never gets mentioned during the course of the employment relationship, though it essentially rewrites a fundamental term of the annual agreements, without producers being aware the annual agreements have been rewritten. By Defendant's reasoning, Defendant could have required Plaintiff to sign an annual agreement on the day it changed its name from "Talbot" to "Hub International Southwest Agency Limited," and then, on the day after it changed its name, fire Plaintiff, point to the Talbot Agreement, and keep all of the clients Plaintiff had cultivated and kept from his previous employment experiences. Such a conclusion asks the Court to conclude the absurd is reasonable. It, by its very definition, is not.

## V.     CONCLUSION AND ORDERS

The 2008 HUB Agreement supersedes any previous employment agreement between Plaintiff and Defendant. Because Defendant and Talbot are actually the same entity, the 2008 HUB Agreement incorporates the Talbot Agreement. The Talbot Agreement contains a valid and enforceable solicitation bar, as reformed by the Court in this Order. Accordingly, the Court enters the following orders:

1.      "Plaintiff's Motion for Partial Summary Judgment" [Rec. No. 18] should be, and is hereby, **DENIED**, subject to the Court's reformation of the non-solicitation provision of the Talbot Agreement, to wit:

   a.      Plaintiff is **BARRED** from soliciting any clients he acquired after he became Talbot's employee in 2002.

b.    Plaintiff **MAY SOLICIT** clients from his pre-existing book of business, that is his book of business **PRIOR** to becoming Talbot's employee in 2002.

2.    "Third[-]Party Defendant's Motion for Summary Judgment" [Rec. No. 23] should be, and is hereby, **DENIED**, subject to the Court's reformation of the non-solicitation provision of the Talbot Agreement, to wit:

a.    Plaintiff is **BARRED** from soliciting any clients he acquired after he became Talbot's employee in 2002.

b.    Plaintiff **MAY SOLICIT** clients from his pre-existing book of business, that is his book of business **PRIOR** to becoming Talbot's employee in 2002.

3.    "[Defendant]'s Cross-Motion for Partial Summary Judgment and Response to Plaintiff's Motion for Partial Summary Judgment" [Rec. No. 25] should be, and is hereby, **GRANTED** in part and **DENIED** in part.  The Talbot Agreement's non-solicitation provision is enforceable only as follows:

a.    Plaintiff is **BARRED** from soliciting any clients he acquired after he became Talbot's employee in 2002.

b.    Plaintiff **MAY SOLICIT** clients from his pre-existing book of business, that is his book of business **PRIOR** to becoming Talbot's employee in 2002.

**SO ORDERED.**

**SIGNED** this **1**st day of **April, 2009**.

**FRANK MONTALVO**
**UNITED STATES DISTRICT JUDGE**